STATE OF IOWA, Appellee, v. SIGFRID TRYBOM, Appellant.

HOMICIDE: Murder—Accidental Killing—Instructions. The supported theory of *accidental* killing must be covered by appropriate instructions—especially when specific request is made for such instruction.

*Appeal from Montgomery District Court.*—GEORGE W. CUL-
LISON, Judge.

APRIL 3, 1923.

THE defendant was indicted and tried in the court below
on a charge of murder in the first degree. He was convicted of
murder in the second degree, and sentenced to imprisonment
for life in the penitentiary at Fort Madison. From this judg-
ment and sentence he appeals.—*Reversed.*

*W. C. Ratcliff,* for appellant.

*Ben J. Gibson,* Attorney-general, *Maxwell A. O'Brien,* As-
sistant Attorney-general, and *Floyd E. Billings,* County Attor-
ney, for appellee.

STEVENS, J.—Emanuel Trybom died October 30, 1920, from
the effects of a gunshot wound in his right side, just below the
nipple. The defendant is the brother of the deceased, and was
the only other person present at the time the shooting took place,
in the room of the small house in which they lived together. He
was immediately accused of the killing, taken into custody by
a local peace officer, and placed in jail. An indictment charg-
ing him with murder in the first degree and a conviction there-
under of murder in the second degree followed. The house con-
sisted of three rooms downstairs, arranged in a row, north and
south. There was a door in the southeast corner of the north
room, and in the same corner of the middle room. There was
also an outside door in the east side of the middle room, and
one in the west side of the south room, which room was used
as a kitchen. The furniture in the north room, where the
tragedy occurred, comprised a dresser, which stood against the
north wall, a short distance from the east wall, near the north-
east corner, and a bed, on which the defendant slept, in the
southwest corner. There was a small stand, a stove, and a bed
in the middle room, on which the deceased slept. The fatal
wound was inflicted late in the forenoon, death following a few
minutes thereafter. Besides the two brothers, the only persons
in the house at the time of the shooting were Carl Larson, who

was in the middle room, and Gus Olson, who was in the south room, or kitchen. The defendant, Larson, and Olson, returning from Red Oak, where they had gone the preceding night, arrived at the house about 8 or 9 o'clock in the morning. The witnesses agreed that the defendant spent most of the time during the forenoon in the north room, reading, or lying on the bed. All of the parties had been drinking, and the defendant was, to some extent at least, intoxicated. A few minutes before the shooting, the defendant came from the north room to the door in the southeast corner thereof, and made some boast to the three men who were in the middle room that he was a scientific boxer, and evidently jokingly challenged them to a bout with him. The challenge was not accepted. Olson testified that the deceased and the defendant became angry, and an angry verbal altercation between them ensued; but, so far as the evidence shows, neither made any threats or demonstrations of any kind, except that the defendant, when he first entered the doorway, put up his hand in the attitude of boxing. A few minutes after this altercation took place, the deceased went into the north room, to which the defendant had returned, and almost immediately the fatal shot was heard. No conversation apparently took place between the brothers after the deceased entered the north room. Olson and Larson immediately entered the north room, after they heard the report of the gun, and saw the deceased lying on his right side, about the middle of the room north and south, and between the bed and the east wall, with his head to the west and his body doubled up. The defendant was standing a short distance north of the deceased, and near the southwest corner of the dresser. A shotgun was lying in front, or to the southwest, of the deceased, with the stock to the west. The defendant left the room as soon as Larson and Olson entered it, going across the street to the home of his parents. The constable who arrested the defendant shortly after the tragedy testified that he was noticeably under the influence of liquor, and that he stated, in explanation of what had occurred, that he had to do it; that the deceased had abused him in the past; and that he was afraid of him. Although the defendant took the stand in his own behalf, he did not deny the testimony of this witness.

The defendant testified that he was left-handed; that, when deceased entered the room, which was without his knowledge, he was standing near the southwest corner of the dresser, holding a shotgun about level with the top thereof, fitting a quantity of old shells into the gun, for the purpose of ascertaining whether they had swollen; that the gun was equipped with a safety device; that, while he was thus engaged, the deceased grabbed the gun barrel at its outer end, and said, "Let me have that gun;" that he, the defendant, let loose of the gun; that it. dropped, and in some way the right barrel was discharged; that he then turned around, and for the first time saw the deceased in the north room. He further testified that he did not intend to in any way injure or harm his brother, and that the gun was accidentally discharged. The only statement made by the deceased was to one of the witnesses who first entered the room, and was that "I am done for." There was a small pool of blood on the floor near where the body was lying. Two or more witnesses who examined the premises some months later testified to the presence of stains upon the edge of the door in the southeast corner of the north room and upon the wall about five feet above the floor in the middle room, which they thought resembled blood stains. This testimony was opposed by the contrary opinion of witnesses called by the defendant, who admitted the presence of the stains, but denied that they were blood stains.

The foregoing general recital of evidence will suffice, for present purposes. As already appears, the defendant claimed and testified that the fatal wound was unintentionally and accidentally inflicted. This was the sole defense offered by him. The court refused the request of his counsel to instruct the jury as to this defense. This ruling is the principal error alleged by appellant.

The instructions of the court were unusually clear and complete, and covered every phase of the case, except the defense that the killing was accidental. This defense is not referred to, directly or indirectly, in any of the instructions given to the jury. The court instructed fully on the subject of intent, but, in the course of its charge, said:

"If it appears from the evidence, as before explained, that

an assault was committed upon Emanuel Trybom that caused his death, and that the defendant committed said assault, still, if it appears that in so doing the defendant did not intend to take the life of Emanuel Trybom, or to inflict upon his person some serious bodily harm, but only to frighten him, or to inflict such injuries as would result from an ordinary whipping or battery, then the offense would not be greater than manslaughter, and it would make no difference that the death of Emanuel Trybom resulted from such assault, if, in committing same, the defendant did not intend to take the life of Emanuel Trybom or to inflict upon his person some serious harm.''

Manifestly, the instructions on the subject of intent could not take the place of proper instructions on the defense of accidental killing. This defense is not, like self-defense, based upon justification or excuse, but is one that inheres in the very act charged, and negatives the alleged crime. The evidence of the defendant, if fully believed by the jury, entitled him to an acquittal. Notwithstanding this fact, the court ignored this issue altogether. With the reasonableness and weight of the evidence we have nothing to do: that is for the jury. It was, however, clearly error for the court, under the evidence, not to instruct the jury as to this defense. *State v. Hartzell,* 58 Iowa 520; *State v. McCaskill,* 160 Iowa 554. See, also, as bearing upon this question, *State v. Ockij,* 165 Iowa 237; *State v. Matheson,* 130 Iowa 440; *State v. Matheson,* 142 Iowa 414; *State v. Klute,* 160 Iowa 170. The question requires no further discussion.

The answer made by the State to this contention by the defendant is that the evidence, at most, raised a mere possibility or conjecture, which is wholly inconsistent with the physical facts. The facts stated above sufficiently refute this contention.

Error is also predicated upon the overruling of the challenge of the defendant to several of the jurors for cause. We need not pass upon these rulings. Suffice it to say that the competency of some of the jurors examined may well be doubted.

For the error pointed out above, the judgment of the court below must be and is—*Reversed.*

PRESTON, C. J., FAVILLE and DE GRAFF, JJ., concur.