[Crim. No. 4561.   In Bank.   Dec. 1, 1944.]

THE PEOPLE, Respondent, v. ABE FOX, Appellant.

Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, T. G. Negrich and Frank Richards, Deputies Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

EDMONDS, J.—In a trial upon an indictment charging the two offenses, Abe Fox was convicted of grand theft and acquitted of receiving stolen property. He now challenges the judgment upon the ground that the evidence is insufficient to support the verdict, and that the trial court erred in receiving certain testimony relating to asserted confessions made by him. He also complains of the court's refusal to give several instructions which he proposed.

The prosecution of Fox is based upon the theft of a large quantity of cigars and cigarettes. The undisputed evidence shows that on January 11th, a short time after a truck was left near the dock of the System Freight Service, it was stolen by an unidentified person. When it was found, the cigarettes and other merchandise were missing.

At that time Fox owned a drugstore and was a customer of Alex Gorberg, who sold restaurant and soda fountain supplies. Police officers investigating the theft placed Gorberg under arrest and charged him with receiving stolen property.

When Fox, accompanied by an attorney, went to the police station for the purpose of securing Gorberg's release from jail, Fox was arrested and for about forty-eight hours was held in custody without a warrant of arrest. Later, Fox and Gorberg were separately indicted, the charge against Gorberg being that he received, as stolen property, the cigarettes which had been taken from the freight truck.

The evidence relied upon by the district attorney to support the judgment of conviction consists entirely of the testimony of Gorberg, who declared that he disposed of a large quantity of cigarettes for Fox, and of police officers who related asserted conversations which they had with Fox during the time he was under arrest. In those conversations, the officers stated, Fox made certain confessions concerning the theft of the merchandise from the truck and the means which he took to store and later to sell it.

When called as a witness for the People, Gorberg stated that his testimony was given under a promise of immunity made by the district attorney, as he was then under indictment. He told the jury that on a day in January, the date of which he could not recall, Fox told him he had a quantity of cigarettes for sale. This conversation occurred at Fox's place of business. After several days, when he was again at the Fox store on a routine call, Fox informed him that he had ninety-six cases of cigarettes which he would sell at $50 a case. Fox also spoke of certain cigars he had for sale but said he had not then ascertained their value.

Two days later, the witness declared, he was at the drugstore on a business errand and Fox offered him the entire lot of cigarettes for $46 a case. On a Friday near the end of January, Gorberg again went to the Fox store. Gorberg then told Fox that he had arranged to sell the ninety-six cases of cigarettes to the Bower Tobacco Company at $50 a case, delivery to be made the next day and Fox agreed to give him $4.00 per case profit for his part in the transaction.

From the garage at the rear of the Fox store, Gorberg continued, he and Fox loaded ninety-six cases of cigarettes into a truck, and he delivered them to the tobacco company. Two trips were required. Upon the return of Gorberg, Fox asked when payment would be made and Gorberg replied he would get it as soon as one Newman, through whom the sale had been made, received the money from the tobacco company.

That evening about 5 p. m., said the witness, he delivered $3,360 to Fox in a paper bag. The money was in five, ten and twenty dollar bills. The following Tuesday afternoon, Gorberg testified, he gave Fox $1,150, the balance of the money due. All of the money which he gave Fox came from Newman. Concluding the account of his dealings with the appellant, Gorberg stated that a few days later he received a case of cigars from Fox at a warehouse garage on East First Street, to which Fox had a key. The cigars were taken from a pile of merchandise covered with a tarpaulin, and Fox told him that he had brought them from the garage at the rear of his store.

All of the other testimony tending to prove participation by Fox in the theft of the cigarettes was given by Captain G. A. Chilson, Officer Fred H. Doane, and Officer R. E. Varela of the Los Angeles Police Department, who related conversations assertedly had with the appellant during the time he was in custody. The policemen said that Officers Hanson and Hollery were present from time to time and also participated in the questioning of Fox. As the foundation for the presentation of Fox's statements to Captain Chilson and Officer Doane, each of them asserted during his examination by the district attorney that the declarations were made freely and voluntarily; also, that Fox did not speak under the compulsion of any force or threat or undue influence nor was any promise of immunity or reward made to him. Over the objection of Fox that his statements had not been made freely and voluntarily, the testimony of the officers was received in evidence.

According to their accounts of these conversations, when Fox appared at the Newton Street police station to secure the release of Gorberg, Varela took him into custody for investigation. At the first conversation, Fox was questioned principally by Hanson and Doane. Asked whether he knew anything about cigarettes stolen from a System truck, Fox denied having any knowledge concerning them. The officers then told Fox that, according to information given them by Gorberg, the cigars and cigarettes had been stored for a time in a garage behind Fox's store and were later removed to a warehouse on East First Street. Fox still insisted that he knew nothing about the stolen goods or any place on First Street where they had been stored. He denied having a key to any

such building and upon search of his person no key was found.

Chilson and Hanson then left the room and according to Doane, who was alone with the prisoner, he told Fox that the police would find his fingerprints on the merchandise. Fox then stated that he had merely permitted Gorberg to store the goods in the garage behind his place of business and, later, helped Gorberg move the goods to the First Street garage. Doane told Fox the police knew more about the case than he thought and demanded the key to the warehouse. Fox said he did not have it, and as he had also told the officers that his wife was expecting a baby and was in a delicate condition, Doane said that they would get a police matron and search the house ''because we know that key is there.'' Fox then admitted having the key at home and agreed to produce it.

This was about nine o'clock on Saturday night and the officers, with Fox, left the detective room for the Fox home. On the way out of the building, Fox said that he had changed his mind; he did not know anything. Nevertheless, the party got into two automobiles, Chilson, Doane, Varela and Fox in one of them. Again being told by Chilson that Gorberg had given them complete information concerning the theft, and by Doane that they would have a police matron search his home, Fox then said that, under the circumstances, he would produce the key.

When driven to his home, Fox obtained the key and the party then proceeded to a warehouse on East First Street. They entered and Fox, pointing to a pile of merchandise covered by a tarpaulin, said: ''There it is.'' He then stated that the goods belonged to Gorberg and he was in no way involved; he had only accommodated Gorberg by permitting him to use the warehouse. Fox stated he had been in the building only on three occasions after the merchandise was stored there. He named these times as the day he helped Gorberg move it there, another visit for an unspecified purpose, and on an occasion when Gorberg went to the warehouse to obtain a case of cigars.

Fox was next taken to police headquarters in the City Hall for further questioning. It was then about midnight. Gorberg and all of the officers except Varela were present. Gorberg was asked if Fox was the person who had assisted him in loading the cases of cigarettes on the truck used to deliver them to the Bower company. Gorberg replied in the affirma-

tive, and Fox remained silent. Asked to tell in detail the facts concerning his participation in the acquisition and sale of the cigarettes, Gorberg told substantially the same story related by him as a witness upon the trial of Fox. When Gorberg had finished, Fox was asked for a statement and he replied that he had nothing to say.

The next conversation with the police officers took place later that night at Newton Street station. The questioning commenced at about three o'clock Sunday morning and continued for three hours. Fox had been given no opportunity to sleep during the night because, said Chilson, "we were moving around on the investigation." At this conversation, which was with Chilson and Doane, Fox maintained that the merchandise belonged to Gorberg. Other than permitting Gorberg to store it in the two garages, said Fox, he was in no way involved.

Chilson then left Fox alone with Doane, who opened the conversation by saying that the police knew more than he imagined; that they had tapped a telephone conversation between him and Gorberg. Fox then stated that two days before the System truck was taken he received a telephone call from an individual he named his "banker." This person, Fox said, asked him if he could handle a large load of tobacco. Fox declared that he passed it off as "big town talk" and thought nothing more about it until, to quote Doane, "he received a telephone call stating the load was taken." Fox then told his informant where to take the load and proceeded to the appointed rendezvous. There he saw a man "standing on the corner with an overcoat and a mustache; he knew the man to be the man . . . that brought the load there; that he circled the block . . . a couple of times and the man disappeared." He got on the System truck and drove it to the garage at the rear of his Boyle Street drugstore and unloaded its contents. He then parked the truck where it was found by the police. During this questioning Fox also said, the officer told the jury, that he knew he had three hours before the theft would be discovered and reported; that the job was set up by a System man and the truck had been driven away by "a two time loser." But he refused to divulge the place of the rendezvous where he obtained the truck.

On the afternoon of the next day, Monday, Varela drove Fox from the Newton Street station to the City Hall. On the way, Varela testified, he asked Fox what it was all about.

Fox replied that his attorney had told him he had already talked too much. He had nothing to do with the theft, Fox then said; the merchandise belonged to Gorberg; it was an inside job and if he was released he would produce the thief.

At the City Hall Fox was delivered to Chilson. Doane, Hollery and Hanson were present, as was Varela. Fox said he wanted to assist the officers. Chilson replied that they wanted to know the identity of the persons involved in the theft. Fox said he did not know who drove the truck in the first instance, but added the man he spoke of as "his banker" was the man above him. Fox stated that, as "he had to protect that man," he could not divulge his identity. He added, however, that he was not adverse to "his banker" being prosecuted but, Chilson testified, he said the police would have to develop their case without his assistance.

Three hours later, the officers and Fox left the City Hall to obtain a meal. Again Fox stated he wanted to help the police because, being a family man, he could not afford to go to the penitentiary. If he could be released, he said, he would make "his banker" reveal the identity of the thief. Fox promised to give this information to the police, and he repeated that the theft was a set up job, engineered by a System man and a two-time loser. When Chilson returned to the City Hall with Fox, he learned that a writ of habeas corpus on behalf of Fox had been served at the Newton Street station. Varela took Fox there and he was released.

Examined by his counsel regarding his detention and interrogation by the police, Fox testified that at all times he was cooperative; stating the goods belonged to Gorberg and he had nothing to do with the theft. When asked about the conversations related by the officers, Fox categorically denied all of the statements assertedly made by him other than those of innocence. He said he was arrested at the police station early Saturday evening and questioned until about six o'clock the next morning. He was then taken to the drunk tank where there were "a batch of Mexicans and colored fellows" and left with them. The tank had two beds. Confined there all of Sunday, he was unable to sleep and during that time photographers took him upstairs "and were trying to take a picture" of him.

Sunday night the questioning continued, said Fox. According to him, "they kept asking me what I knew about it, and

if I knew who the thief was and all of that, and I told them I didn't know anything about it, and I said that Mr. Gorberg knew all about it, I understand, and they should ask him . . . I told them my wife . . . was due with a baby any moment, . . . and it was a very dangerous condition, and I asked them to let me out, and they told me they were going to keep me unless I did some talking, and I told them I didn't know any talking to do. . . . Officer Chilson, and Doane and Varela, they were all with me at one time or another, and if I was not with Chilson I was with Doane or Varela. I was always with an officer. . . . It was the same thing over and over again. They would ask me the same questions and I would give them the same answers. . . . They would take me into a room and question me maybe 15 minutes, and then walk away, and I would sit there maybe half an hour and they would question me all over again, and time went slow and went fast.''

After considering this and other evidence the jury returned a verdict of guilty upon the charge of grand theft but found Fox not guilty of the offense of receiving stolen property. His appeal from the order denying a new trial and also from the judgment of conviction urges, as the principal ground for reversal, that the evidence is insufficient to support the verdict. In addition, he asserts, the trial court erred in receiving testimony concerning his asserted confessions and in refusing to give to the jury several instructions proposed by him.

In his first brief, the attorney general, in effect, admitted that there is no evidence ''from which an inference may be drawn beyond a reasonable doubt, that defendant aided and assisted in the theft and abetted the act with knowledge and intent of aiding the actual perpetrators in stealing the truck of merchandise.'' In conclusion, he said: ''We cannot help but conclude that if the defendant was guilty of any crime, it was for receiving stolen property and . . . it is respondent's sincere belief that defendant should not have been convicted of grand theft on the statements he made. We express the belief that a conviction of receiving stolen property would have been warranted and would have been sustained.'' But in a supplemental brief, the People vigorously challenge each of the appellant's points and insist that the judgment should be affirmed.

The corpus delicti was proved by testimony showing that the truck was driven away from the System freight dock

by an unidentified person who, the witness stated, was not Fox. All of the other evidence tending to show that Fox committed the crime of grand theft is included in his statements to the police. These statements, as related by the witnesses, were given in reply to the questioning of the officers and particularly to Doane when Fox was left alone with him. According to the record, during the forty-eight hours in which Fox was at the police station or at detective headquarters, he said that two days before the System truck was taken he received a telephone call asking him if he could use a large quantity of tobacco; he received a second telephone call twenty minutes before the load was taken; at that time he designated the place where he would meet the truck; he went to that place and the truck, with its driver, was there; after he circled the block twice, the man had disappeared. Fox then drove the truck to the garage in the rear of his store where the merchandise was unloaded. Later he left the truck at the point where it was found by the police. In further explanation of the theft, Fox explained that the job was "set up" by a man on the freight dock and that "a two time loser" had driven the truck from the System building to the appointed rendezvous.

The evidence, aside from the statements of Fox and the testimony establishing that the truck was driven away from the System building by a person other than Fox, relates only to his possession of the cigarettes and the sale of them through Gorberg. It is entirely insufficient to support a conviction of grand theft and, so far as that charge is concerned, shows only corroborating circumstances tending to prove the crime. The judgment may be affirmed, therefore, only if the statements of Fox properly could have been considered by the jury as evidence of his guilt.

As against the assertions of the policemen that all of Fox's statements to them were freely and voluntarily made stands his account of what transpired during the time he was in custody. It appears that he was then twenty-eight years of age and the owner of his own business. He was arrested about six or seven o'clock in the evening and subjected to questioning for the next twelve hours. Meanwhile, he had been taken by the officers to his home where his wife was expecting the birth of a child. He was then put in a "drunk tank" among other prisoners and with neither the facilities nor the opportunity for mental or physical rest. During the

day he was taken out of the cell for the purpose of being photographed, and it may be inferred that this was done to add to his humiliation and mental upheaval. The questioning was continued that night and, if his testimony is to be believed, for forty-eight hours he was given no opportunity to sleep.

The court refused to instruct the jury, as requested by Fox, that ''before you can consider any alleged confession of the defendant as evidence against him, if you find that the defendant has made a confession, you must believe that such alleged confession was freely and voluntarily made, and was not the result of inducement, coercion, intimidation, threats, violence, promises or duress exercised by any officer of the law, or any other person, upon the defendant. Unless you believe that such alleged confession was freely and voluntarily made by the defendant, with full knowledge of its meaning and effect, then you must disregard such alleged confession entirely from your consideration.'' Another instruction also proposed by Fox and rejected, reads: ''In considering whether an alleged confession is freely and voluntarily obtained, it is necessary that you should take into consideration the time, the place, the party to whom, and the circumstances under which the said alleged confessions were made. In doing so you must consider all the conduct of the parties who were present when the alleged confession was made, not only at the time of such conduct, but at all times while the defendant was under their custody, control or dominion or were able to exercise or apparently exercise authority over him.'' The court also declined to give five other instructions presented by Fox stating, in varying form, that it was the duty of the jurors, if they believed he made any incriminating statements, to consider the circumstances under which he talked with the police officers and to disregard any and every admission which was not his free and voluntary act.

The attorney general argues that no rights of the appellant were transgressed by the police officers. He says: ''Appellant states that the court erred in receiving testimony concerning the confession evidence. . . . What one court may consider to be fair play might be considered unfair by another court and vice versa. . . . The record in the instant case is exceptionally free from any of those methods severely criticized by the courts in obtaining a confession from an accused. The

evidence shows that appellant was treated fairly and without any abuse of his person or fundamental rights, and that whatever statements he made were of his own volition." But by refusing to submit to the jury the issue as to whether the statements of Fox had been improperly obtained, the court deprived the appellant of a determination in that regard.

■ Although the question as to the admissibility of a confession is, in the first instance, necessarily one of law for the trial judge (*People* v. *Jones,* 24 Cal.2d 601 [150 P.2d 801]; *People* v. *Rogers,* 22 Cal.2d 787 [141 P.2d 722]), if the evidence is received, "it is for the jury to determine whether the confession was freely and voluntarily made and therefore entitled to consideration." (*People* v. *Dye,* 119 Cal.App. 262, 270 [6 P.2d 313].)

■ Certainly, the testimony of Fox directly contradicted in essential particulars that of the police officers, and it was the duty of the jurors first to determine whether he acknowledged to those witnesses, as claimed by them, the circumstances concerning the theft of the cigarettes and his participation in the crime. If they concluded that he had done so, then Fox was entitled to a determination by the jury upon the issue presented by his testimony relating to the manner in which his confession had been obtained. ■ The fact that statements are made while one is under arrest does not make them involuntary or inadmissible; on the other hand, a confession which is given as the result of either threats or inducement must be entirely disregarded in a court of law. An involuntary confession is no confession. (*People* v. *Jones, supra; People* v. *Rogers, supra;* and *People* v. *Williams,* 20 Cal.2d 273 [125 P.2d 9].)

The judgment is reversed and the cause remanded for a new trial.

Curtis, J., Carter, J., and Traynor, J., concurred.