STATE OF IOWA, appellee, v. WILBUR C. BAKER, appellant.

No. 48355.

(Reported in 66 N.W.2d 303)

216

September 21, 1954.

Rehearing Denied November 19, 1954.

Charles W. Bowers and Charles J. Cardamon, both of Des Moines, for appellant.

Leo A. Hoegh, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, Peter B. Narey, County Attorney of Dickinson County, of Spirit Lake, and James R. Hamilton, County Attorney of Buena Vista County, of Storm Lake, for appellee.

BLISS, J.—It is undisputed that at about five o'clock in the morning of July 30, 1952, Anna Belle Baker, from whom defendant was divorced, while she was in bed with her sister, Loretta Elgenson, in a downstairs bedroom in the home of her father, W. G. Boardman, near the town of Milford, Dickinson County, Iowa, was struck by the discharge from a shotgun in the hands of the defendant. There was testimony that the wound was accidentally inflicted. Mr. Boardman, in his bedroom on the second floor, heard a car enter and stop in his driveway, and saw defendant get out of the car and heard him enter the house without knocking on the door. He then heard some conversation downstairs and saw defendant leave the house and go to the car, and then return to the house, and, as Mr. Boardman was dressing to go downstairs, he heard what he thought was the discharge of a shotgun. He then saw defendant immediately leave the house and enter the car and drive away. On going to the bedroom downstairs, Mr. Boardman found his daughters, Anna Belle and Loretta there, and was told by them that defendant had shot Anna Belle. Upon removing the bed covers over Anna Belle he saw the gunshot wound along the outside of her right leg on the upper third thereof. Doctors who were called testified that there was a deep flesh wound about seven inches long and four inches wide, and other shot perforations in the lower abdomen, and in the face and hands of Anna Belle.

The following matters appear without dispute: the defend-

ant drove at once from the Boardman home to the Maid-Rite Restaurant in Milford, and told the woman in charge that he had just shot and killed his wife, and asked her to call the sheriff. The local policeman was called, and defendant told him he had shot and killed his wife, Anna Belle Boardman, at her father's home, and asked to be taken to jail. Defendant gave him his two 20-gauge shotgun shells one of which had been exploded, and told him to "get the gun" in the back seat of defendant's car, which was done. The policeman took defendant to Spirit Lake and delivered him, with the gun and shells to the sheriff of Dickinson County. Defendant said to the sheriff: "I just shot Anna Belle." The sheriff said to him: "Did you kill her?" and defendant answered: "Yes." He also told a deputy sheriff, the chief of police of Spirit Lake and the County Attorney of Dickinson County, that he had shot "his wife." He so referred to Anna Belle, though their marriage on February 20, 1950, had been dissolved by decree of divorce on April 19, 1952.

At 6:30 in the morning of July 30, 1952, in the police station of Spirit Lake, Iowa, in the presence of the chief of police, the defendant while in custody was interrogated by the county attorney, and the questions and answers were taken in shorthand by an official court reporter of that judicial district. Defendant was advised by the county attorney that he need make no answers, if he so desired, that he could have counsel if he wished, and that whatever he said might be used against him in court. Defendant stated that he knew of these legal rights, that he wished no legal counsel, and that he was willing to answer questions. He admitted as a witness at his trial that no promises or offers of immunity had been made to him to induce him to give the statement. When the examination was finished he signed his name to the last sheet of the shorthand notes and initialed the other sheets. He stated, in substance, in his answers that: he and Anna Belle had been divorced in the spring of 1952, and shortly after she had gone to Chicago; he had visited her there and she told him she would come back if he would buy her a house and a car; that he bought the house and bought another car and gave her his Chrysler car; she and her sister from Illinois came back to Spirit Lake, and after about a week the sisters started going

out, and he begged Anna Belle to stop; he and Anna Belle went out one night to some of the resort places, and "the guy she had been going with was there", and beckoned her away from him and when they came back he "went out and hit him on the chin"; Anna Belle became angry and told defendant she hated him; she took her clothes from defendant's cottage where she and her sister, Loretta, and the latter's husband had been staying, and she and her sister went to her father's home, and thereafter she and the man he had hit continued to go together; on the night of July 29, 1952, he inadvertently contacted Anna Belle and her brother and his wife and the sister from Illinois at the Peacock Inn; when he tried to talk with her she told him to get away from her, and told him she had been to bed with this fellow the night before and was going with him again that night; he then left the place and went home but could not sleep and he called a friend from Minneapolis who was visiting in Spirit Lake to come to defendant's cottage and talk to him, which was done, and the friend told him to take some sleeping tablets and go to bed; he could not sleep and he decided to drive to the Boardman home and talk to Anna Belle. He was asked:

"Q. Did you take your gun with you? A. I had it in the car. Q. Did you take it from the house to the car? A. No, it was already in the car. It was a shotgun. It has been in the car. I went in and tried to talk to her and she was in bed with her sister and she told me to get out. I went and got the gun and came back and shot her. Q. Was she in bed when you shot her? A. Yes. Q. Then you went back ———. A. I drove to Milford and I told the girl in the Maid-Rite I had shot my wife—I referred to her as my wife. She called the sheriff, or called you [County Attorney] and called somebody that he should call them and I rode over here with the policeman from Milford. * * * Q. Wilbur, where were you standing when you shot her? A. At the foot of the bed. * * * Q. Wilbur, when you put the gun in the car yesterday afternoon whom were you going after; were you going after Anna Belle or this fellow in Spencer? [The man he hit on the chin.] A. I thought I was going after the fellow at Spencer until I talked to him. Q. You say you and Anna Belle were going to be married the sixth of August? A.

That is what she promised me when she came back. Q. That was George's gun, wasn't it? [George was his brother.] A. Yes. Q. You borrowed it yesterday afternoon? A. Yes."

The court reporter who took the examination of defendant and transcribed his shorthand notes gave the material parts of it as a witness for the State. During the course of the examination some inquiry was made whether Anna Belle had died. It was ascertained by telephone communication to the hospital that she was living, but it was not known how seriously she was injured. At the conclusion of the examination, defendant was taken to the jail. About seven o'clock of the morning of July 30, 1952, the chief of police of Spirit Lake went to the jail and found defendant hanging by his neck in the cell. He was hanging by his belt and was limp and unconscious and had difficulty in breathing. He revived after being cut down.

Concerning the hanging, defendant testifying for himself said he thought Anna Belle was dead—the sheriff had told him so—and he had no desire to live, so he attempted to end his life by fastening his belt to a bar in the highest part of the cell and tied it to the buckle around his neck and jumped off the bunk in his cell. There was testimony introduced by the State that there was no mention during the questioning of defendant that Anna Belle was dead, and that the sheriff was at no time present. In large part defendant's testimony in his own behalf was in accord with his answers given to the county attorney, set out above. There were some denials and inconsistencies—the chief one being with respect to the shooting. Of that, he testified on direct examination: "When I arrived at the Boardman home, I stopped the car in the driveway and got out of the car, and went into the house and into the bedroom where I knew Anna Belle always slept when she was at her father's place. Anna Belle and her sister were in bed, and I sat on the edge of the bed and shook Anna Belle until she woke up. I started to talk to her and told her that I was unable to sleep; life to me had come to the point where it wasn't worth living if I had to carry on in the condition I was then. She told me to get out, that she didn't want to talk to me at that time. So I went out and went to the car. I saw this shotgun laying in the back of the car, and the first

thought that entered my mind was to kill myself. I thought the best place to do it would be in front of Anna Belle. So I took the gun out to examine it to see if it was loaded, and it was. I went back into the house. Anna Belle was still awake, and I told her: 'Anna Belle, I am going to kill myself.' At that she rose up in bed and grabbed the barrel of the gun and pulled it down, and at that moment the gun was discharged. I thought I had killed her. I saw the hole in the bedspread and looked at her, so I went back and got in the car and drove to Milford to the Maid-Rite Restaurant. I stopped and asked the lady in there if she would call the police. I thought I had killed my wife. She asked me if I was sure, and I said, 'I think I must have killed her.'" He testified that when the policeman came, and when he separately contacted the sheriff, the county attorney, the court reporter, and the chief of police, in the early morning of July 30, 1952, he said to each of them: " 'I thought I had shot my wife.'" To none of them, nor to the woman at the Maid-Rite Restaurant, did he say that the shooting was accidental; or that as he was about to shoot himself, his wife grabbed the barrel of the gun and pulled it down and the gun was discharged and the shot struck her. He testified on re-cross-examination: "I could have reported an accident to the officers, but I did not and have not."

Of the shotgun, he testified: "It belongs to my brother George. I borrowed the gun off of my brother's wife. How the gun got in the car I don't know. I had had it in the house and the case in which the gun came was in the house. I didn't put the gun in the car. I first learned the gun was in the car when I came out of the Boardman house that morning after seeing Anna Belle." Cross-examination: "I had seen the gun before, but I didn't know it was in the car. The shells were in the gun."

The room in which Anna Belle was sleeping was in the southwest corner of the house. Describing the situation, defendant, in redirect examination, testified: "The head of the bed in the Boardman home was to the south, and the foot of the bed to the north. The head of the bed was against the south wall, and the east side of the bed was against the east wall. I stood at the northwest corner of the bed and slightly to the south of the

corner. When I first came in I was sitting on the edge of the bed talking to Anna Belle. The second time I stood at the end of the bed, where I indicated. Anna Belle was on the west side. * * * I think I had the gun something like that [indicating]. I don't recall exactly." With respect to the two shotgun shells defendant testified: "The exploded shell is the one that was fired out of the gun."

On cross-examination, defendant testified: "I didn't ask her [the woman at the Maid-Rite Restaurant] to call a doctor nor did I ask her to get some help to go out there right away and see what could be done to save her life, if anything, because I thought Anna Belle was dead."

Anna Belle was taken to the hospital in Spirit Lake on the morning of her injury and remained there for some time during August. So far as the printed record shows her only testimony as a witness for the State was that she was at the time of the trial the wife of defendant. The trial was begun on March 10, 1953, and the jury returned the verdict in the early morning of March 14, 1953. At the time of the trial the defendant was of the age of forty-two years and Anna Belle was twenty-eight years old. They were living in Des Moines at that time. They had been remarried on October 19, 1952.

On July 31, 1952, while Anna Belle was in the hospital, the county attorney and the court reporter took a written statement from her, which she signed and swore to. The statement was: "On the night of July 29, 1952, or early the morning of July 30, 1952, I was sleeping with my sister, Loretta Elgenson, in the home of my father, W. G. Boardman, in Old Town, Dickinson County. On said date I was a single person, having been previously divorced from Wilbur Baker. Upon said date, my sister awakened me and I saw the defendant standing at the foot of the bed with a shotgun in his hand. He said, 'Anna Belle, I am going to kill you.' At that time he shot me. My father called a doctor and I was taken to the Spirit Lake Hospital in Spirit Lake, Iowa. Prior to the shooting, the defendant had threatened to kill me on several different occasions." Her sister, Mrs. Elgenson, was not a witness.

Mrs. Anna Belle Baker was a witness for her husband, the defendant, at his trial. After reference to the incident of July

29, 1952, in the Peacock Inn when she told him to go away and not bother her, she testified: "He left. The next time I saw him was when he walked into my bedroom early Wednesday morning in my father's home on the ground floor. Wilbur walked into the bedroom and I woke up, and he was standing at the foot of the bed. He asked me if I wouldn't come back to him and if I wouldn't talk to him, and I said no, I didn't want to talk to him at that time of night, for him to come back later, and he said no, he wanted to talk to me then, and I said, 'No. Get out! I don't want to talk to you now.' He turned around and walked out. Then he came back in and had a shotgun, and he stood at the foot of the bed and said: 'Anna Belle, if you don't come back with me there is no use of my living anymore, and if you don't come back with me, I am going to shoot myself,' and I thought he was, and he started to raise the gun and I rose up in bed and grabbed the barrel of the gun and pulled it, and as I did the gun went off. What happened then, I don't remember."

She testified that before the meeting of the grand jury in September 1952 she had discussed with the county attorney her testimony before the grand jury, and he produced her sworn statement of July 31, 1952, and told her to testify in accord with that statement. She testified that she did so. Of her testimony before the grand jury, she testified on cross-examination: "I remember reading over the statement I made before the grand jury before I signed it. That statement is false. I made that statement deliberately knowing it to be false."

When she was shown her sworn statement of July 31, 1952, on cross-examination and was asked if she had signed it, she answered: "That is my name there. I signed it. I don't remember saying that, but if I did, it isn't true."

When the State rested at the close of its testimony, defendant moved for a directed verdict of not guilty of the charge of assault with intent to commit murder, on three alleged grounds. The court denied the motion. Defendant then moved that the court reduce the charge to one or more of the included offenses for the reasons urged in the motion to direct. This motion was also denied.

At the close of all the evidence, defendant renewed his

motion to direct a verdict for him as originally made, with an additional ground "that it now appears affirmatively in the case that the discharge of the gun was accidental." The motion was denied.

Defendant then renewed his motion to withdraw from the jury the charge of assault with intent to commit murder, and also moved that the jury be instructed with reference to the included offense of assault and battery. Both motions were denied.

Before instructing the jury the trial Judge, in open court, in substance, stated that: prior to the commencement of the arguments to the jury, counsel for both parties were furnished a rough draft of the instructions proposed to be given and were granted a reasonable time and opportunity to examine them; on the completion of the arguments, the counsel were given the finished draft of the instructions, and, after reasonable opportunity for their examination had elapsed, counsel for the State and for the defendant were asked if either had any objections or exceptions to the proposed instructions; the county attorney said he had none, and the answer of the defense attorneys was: "We again renew our request that the jury be instructed with reference to the included offense of assault and battery." The court denied the request.

The court's instructions were read to the jury and thereafter the verdict of guilty was returned. Until the motion for new trial and the exceptions to instructions were prepared and filed the attorneys for defendant were W. B. Bedell and Jack H. Bedell, of Spirit Lake, and Mack & Mack, of Storm Lake. On April 17, 1953, attorneys for defendant on this appeal filed a motion for a new trial and also exceptions to the instructions. The motion and the exceptions were overruled. The errors assigned and argued for reversal of the court's judgment were set out in the motion for new trial and exceptions to instructions.

I. The first error assigned is: "The court erred in failing to instruct the jury on the defendant's defense that the shooting of Anna Belle Baker was accidental."

In Instruction No. 1 the court defined the crime charged in the indictment as an assault upon Anna Belle Baker with intent to murder her. In Instruction No. 2 the jury was told that to

this indictment the defendant had entered a plea of not guilty, which was a complete denial of guilt and of the crime specifically charged in the indictment, and put in issue every material allegation of the indictment, and the burden was upon the State to prove beyond a reasonable doubt all the material allegations of the indictment, as set out in instructions following.

In Instruction No. 13 the court stated the necessary elements of an assault to commit murder, as follows: 1. The assault, that is, a finding by the jury that defendant did shoot the assailed unlawfully. 2. The specific intent to kill, that is, a finding by the jury that defendant did the shooting with the specific intent to take the life of the assailed. 3. Malice aforethought, that is, a finding by the jury that the act was committed by the defendant with malice aforethought, which means not only hatred and ill will, but also any state of mind which shows a wicked disposition and a heart bent on doing evil. In Instruction No. 14 the jury was told that with these instructions in mind it must determine defendant's guilt or innocence of the crime of assault with intent to commit murder, and that to return a verdict of guilty it must first find that the State had proved beyond a reasonable doubt each and every one of the three essential elements of the crime above-stated, and that if the jury did not so find, it should find the defendant not guilty of the crime of assault with intent to commit murder.

Other instructions were given as to each specific offense included in the principal charge, to wit, assault with intent to commit manslaughter, and assault with intent to commit great bodily injury, setting out the essential elements of each including the intent to commit it.

The following instruction defining intent was given, to wit: "You are instructed that intent is an important element of the crime charged in the information [indictment] and of the included offenses. The intent with which an act is done is an act or emotion of the mind, seldom, if ever, capable of direct and positive proof, but it is to be arrived at by such just and reasonable deductions and inferences from the acts and facts proved as a guarded judgment of the candid and cautious man would ordinarily draw from them. The law warrants the presumption or inference that a person intends the results or consequences

to follow an act which he intentionally commits, which ordinarily do follow such acts. If you find that defendant committed the assault it will be your duty from the evidence to determine his intent in so doing by the surrounding circumstances and all the evidence in the case before you which tends to show intent."

We have referred to such instructions or parts thereof as bear upon the assigned error in this Division I. As hereinbefore noted the only plea of the defense to the indictment was the plea of "not guilty." This plea, as the court instructed the jury, denied and put in issue every material allegation of the indictment, including the element of intent, which was an essential factor in the principal offense charged, and in each of the included offenses. Defendant's plea of "not guilty" was in effect and in fact a general denial. Included therein was a denial of an intent to commit any offense charged or included in the indictment.

The law presumed him to be innocent. The burden of proof on every material issue in the action, with respect to the principal offense charged in the indictment and the included offenses, was on the State. But since a specific intent was the gist of every offense for which defendant was on trial, it was his right to prove any pertinent facts which tended to show a lack of such intent. Accordingly, in his own behalf, he testified at his trial that he had no intention of shooting Anna Belle Baker at the time charged, but that he intended to shoot himself and it was only the act of Anna Belle in seizing the barrel of the shotgun to prevent his self-destruction that the charge or load in the shell was accidentally discharged into her leg and body. He admitted the possession of the loaded gun and that his finger was on the trigger when he poised it to shoot himself, but asserted that he had no intention of shooting Anna Belle, and that she was struck by the discharge only because of her seizure of the gun.

The "nature of the defense", as stated by defendant in his printed argument in this court, is that "he entered a plea of Not Guilty to the indictment and introduced evidence that the shooting was the result of an accident." He admitted his participation in the shooting, but sought to explain it. By his plea of not

guilty he denied his intention to assault Anna Belle in the manner charged, and sought to sustain his denial by this testimony that he had no intention of shooting her. In other words, that the shooting was unintentional, or, as expressed by him, it was "accidental." Anna Belle, who was the wife of the defendant and living with him at the time of the trial, gave testimony like that of defendant as to how she was shot. Both of these witnesses had given written statements—the one by the wife was sworn to by her and she had given testimony before a grand jury—all of which statements and testimony were directly contrary to their testimony in court, as above noted.

■ This testimony, that the shooting was accidental, was given to sustain a denial of intention. It was admissible in refutation of and in rebuttal to the evidence of the State. It was merely incidental to defendant's plea of not guilty. It was admissible as evidence on the question whether defendant was guilty as charged. It inhered in the plea of not guilty, and no special instruction was necessary, particularly in the absence of a request. It was simply evidence to fortify the plea of not guilty. State v. Bosworth, 170 Iowa 329, 336, 152 N.W. 581. Strictly speaking, the claim of alibi is not a defense, since, in the prosecution of many crimes and particularly those of violence, the burden is on the State to establish the presence of the accused at the place of the crime at the precise time it was perpetrated, but this court for many years and by many decisions has held that in a defense of alibi, in the sense of being at a place so distant that participation in the crime was impossible, the burden is on the accused to establish such so-called defense by a preponderance of the evidence. State v. Johnson, 221 Iowa 8, 20, 264 N.W. 596, 267 N.W. 91; State v. Dunne, 234 Iowa 1185, 1191, 15 N.W.2d 296; State v. Maher, 74 Iowa 77, 80, 81, 37 N.W. 2; State v. Debner, 205 Iowa 25, 27, 215 N.W. 721. With respect to the matter we are discussing, that the testimony about accidental shooting was but incidental to defendant's plea of not guilty, language of Judge Adams, in State v. Reed, 62 Iowa 40, 42, 17 N.W. 150, 151, is in point, to wit: "The defendant feels that injustice was done him, because the court did not specifically call the attention of the jury to what he calls his defense

of an *alibi.* He says 'that instructions should be given upon each material *issue,'* * * *. The writer does not regard *alibi* as a *defense* within any accurate meaning of the word, *but as a mere fact shown in rebuttal of the State's evidence."* (Italics ours.)

Notwithstanding under our holdings that an alibi is an affirmative defense, which the one setting it up has the burden of proving by a preponderance of the evidence, in State v. Lightfoot, 107 Iowa 344, on page 351, 78 N.W. 41, 43, in answer to defendant's complaint that "the court did not charge the jury in regard to an alibi", this court said: "No instruction of that character was asked * * * and the court did not abuse its discretion in not referring to the alleged alibi in its charge." This ruling was cited in State v. Brandenberger, 151 Iowa 197, 206, 130 N.W. 1065; State v. Schenk, 236 Iowa 178, 195, 18 N.W.2d 169; State v. Hessenius, 165 Iowa 415, 433, 146 N.W. 58, L. R. A. 1915A 1078; State v. Poder, 154 Iowa 686, 690, 135 N.W. 421; State v. Jones, 145 Iowa 176, 178, 179, 123 N.W. 960.

For the authorities bearing upon our conclusion that the testimony that the shooting was accidental did not entitle the defendant to an instruction thereon as a defense, see State v. Albertson, 237 Iowa 1148, 1153, 1154, 24 N.W.2d 395, and cases cited therein; State v. Debner, supra, 205 Iowa 25, 27, 28; State v. Harrison, 167 Iowa 334, 339, 149 N.W. 452; State v. Nadal, 69 Iowa 478, 483, 29 N.W. 451, 453. In the case last cited error was assigned because of the failure of the court to instruct on certain matters. The court said: "There was really but one issue in the case raised by defendant's plea of not guilty. It involved his guilt or innocence. Matters of dispute arising upon the law or the evidence are not issues which the court ought specifically to present to the jury."

In State v. Albertson, supra, 237 Iowa at page 1153, the court said: "Appellant assigns as error the trial court's failure to give an affirmative instruction upon 'the sole defense of defendant, namely, that the alleged offense was committed by one other than the defendant; *the same constituting a special defense.'* (Italics supplied.) We find nothing in the record that would suggest to the trial court appellant was urging this as a special defense. No such instruction was asked nor any exception taken in the trial court to the failure to give one. * * *. [page 1154].

This so-called 'special defense' is not a defense of alibi though perhaps slightly analogous to it. *We think it inhered in the plea of not guilty and no special instruction was necessary, at least in the absence of a request."* (Italics ours.)

There is no merit to this assignment of error for two reasons: first, it was not a matter on which defendant was entitled to a specific instruction; and, second, if it had been, he should have requested such a charge as he desired, and by his failure to do so he waived any right to thereafter complain. There are issues that entitle a litigant to a specific instruction thereon, even though he does not request it. But the evidence of accidental shooting was no such an issue.

■ It is the duty of the trial court, without request therefor, to fairly present the issues and the law of the case to the jury in order that they may have an intelligent conception of the questions for decision. State v. Wheeler, 216 Iowa 433, 434, 249 N.W. 162; Overhouser v. American Cereal Co., 128 Iowa 580, 585, 586, 105 N.W. 113; State v. Brandenberger, supra, 151 Iowa 197, 205, 206; Gardner v. Johnson, 231 Iowa 1233–1236, 3 N.W.2d 606; State v. Wilson, 234 Iowa 60, 85, 11 N.W.2d 737. There may be matters involved in a case of a nature unfamiliar to a jury which should be explained or clarified by instruction, as in Gardner v. Johnson, supra, 231 Iowa 1233, 1235, where the point in question was the consideration in a contract, or as in Overhouser v. American Cereal Co., supra, 128 Iowa 580, 585, 586, where the term involved was "independent contractor." But in the case before us the matter involved was a plain and simple one, readily understandable by any juror. It was whether the shooting was intentional or unintentional. State v. Friar, 204 Iowa 414–416, 214 N.W. 596. The court instructed on that issue, and the finding of the jury that the act was intentional necessarily involved a finding that it was not accidental. State v. Williams, 238 Iowa 838, 845, 28 N.W.2d 514. In accord with statutory law and rules of procedure defendant had opportunity to make known to the court, before submission of the case to the jury, any objections because of instructions given or not given. He made no complaint to the court and he requested no instructions.

■■ It is a well-settled rule of this court that where an instruction is correct as given, though not as explicit as a party may desire, error cannot be based thereon, in the absence of a request for additional instruction. State v. Stevens, 67 Iowa 557, 559, 25 N.W. 777; State v. Tweedy, 11 Iowa 350, 360; State v. Jones, 145 Iowa 176, 178, 179, and State v. Schenk, 236 Iowa 178, 194, 195, both supra; State v. Harrington, 220 Iowa 1116, 1121, 264 N.W. 24; State v. Bading, 236 Iowa 468, 479, 17 N.W.2d 804; State v. Griffin, 218 Iowa 1301, 1312, 254 N.W. 841, and cases cited; State v. Baratta, 242 Iowa 1308, 1320, 1321, 49 N.W.2d 866; State v. Schrader, 243 Iowa 978, 990, 55 N.W.2d 232. In the court's instruction the jurors were told that before a verdict of guilty could be returned on the principal offense or any included offense they must find that the evidence established beyond a reasonable doubt that defendant made the assault with specific intent to commit an unlawful assault. Had the court instructed on the claim of unintentional or accidental shooting, the instruction of the court would merely have been the converse of the instruction as given, that is, the court would have directed the jury that before the State would be entitled to a verdict of guilty it must have established by evidence beyond a reasonable doubt that the shooting was not unintentional or accidental. A court is not required to instruct both on the affirmative and the negative of a proposition. Certainly not, in the absence of such a request.

In support of his first assigned error defendant cited the cases noted just below. We have examined them and find they do not aid him. In State v. Helm, 97 Iowa 378, 385, 386, 66 N.W. 751, the defendant requested no instruction, and the court held that the instruction given was sufficient. In State v. Hartzell, 58 Iowa 520–522, 12 N.W. 557, there was evidence tending to show the killing was accidental, and this court held the jury should have been instructed as to the law thereon. Defendant was indicted and convicted of manslaughter. The opinion does not show whether defendant requested an instruction or not. He may have asked for such an instruction and the court refused to give it or an equivalent one. In State v. Brooks, 192 Iowa 1107, 1116–1118, 186 N.W. 46, defendant was convicted of murder in the second degree. He asked an instruction on threats the

deceased had made against him, which the court refused to give. It should have been given. The instruction given on self-defense was held to be erroneous. The opinion also stated the rule that an accused is entitled to have his theory of the case explained to the jury. There was no dispute about this rule. State v. Wilson, 234 Iowa 60, 85, 11 N.W.2d 737, was cited on the same rule. In State v. Matheson, 130 Iowa 440, 446–452, 103 N.W. 137, 114 Am. St. Rep. 427, 8 Ann. Cas. 430, defendant was convicted of assault with intent to commit murder. Defendant claimed the shooting was accidental. No issue of a failure to instruct was involved. The judgment was reversed because of an erroneous instruction on accidental shooting. On an appeal in a retrial of the case, State v. Matheson, 142 Iowa 414, 417–419, 120 N.W. 1036, 134 Am. St. Rep. 426, a proper instruction on accidental killing was requested and refused, and an erroneous instruction was given. Reversal was for that reason. In State v. McCaskill, 160 Iowa 554, 563, 564, 142 N.W. 445, defendant was indicted for murder and convicted of manslaughter. The defense was self-defense. Proper instructions requested by defendant were refused by the court and no equivalent instruction was given. Reversal was on that ground. State v. Trybom, 195 Iowa 780–784, 192 N.W. 813, was a fratricide case in which defendant was convicted of second-degree murder. Defendant claimed the shotgun was accidentally discharged. A requested instruction on the issue was refused and the court gave none in its place. The judgment was reversed.

II. The second assigned error was lodged against Instruction No. 22. The challenge against it was that it contained erroneous and conflicting statements of law and invaded the province of the jury. The instruction was: *"When it has been shown that a public offense has been committed, a confession tending to show guilt by the party accused is by law presumed to be true, and it is entitled to credit as evidence of such fact or facts,* but such confession will not warrant a conviction unless accompanied by other evidence that the crime has in fact been committed. Such confession, if any there is, is to be examined by you with care, *and it is for you and you alone to determine what weight will be given thereto,* and it cannot be considered by you unless you find from the evidence beyond a reasonable doubt that

the defendant made the alleged confession and that it was made by the defendant voluntarily and of his own free will and with a full and perfect knowledge of the nature and consequences of the said confession, if such there was. The law so guards the rights of every person accused of a crime that evidence of a confession of a crime of which he is accused cannot be received or considered unless it appears beyond a reasonable doubt that such confession was made voluntarily and freely, and not procured by undue influence, or was not made under the influence of fear, or was not brought about by artifice or deception. It must be shown to have been made freely and voluntarily, uninfluenced by any threat, promise, or deception or fear. *Confessions shown to have been made freely and voluntarily, uninfluenced by any threat, promise, or deception or fear, are entitled to great weight.*" (Italics ours.)

 As we have noted, the confession was not a written statement signed by defendant, but was a question-and-answer interview with defendant by the county attorney, which was read to the jury. The manner in which a confession or admission of facts may be made is immaterial. It may be oral and partly written, or in narrative form or by questions and answers. Underhill's Criminal Evidence (Fourth Ed.) section 276, page 546; State v. Brasseaux, 163 La. 686, 112 So. 650; Bolden v. United States, 63 App. D.C. 45, 69 F.2d 121; Goodfellow v. People, 75 Colo. 243, 224 P. 1051; State v. Scruggs, 165 La. 842, 116 So. 206.

Instruction No. 21 was the usual one directing the jury to the care, caution and deliberate consideration which they should give to evidence of verbal admissions and statements of the defendant. The instruction concluded with the thought frequently expressed in like instructions, to wit: "You are instructed, however, that when such verbal statements are precisely given and identified by intelligent and reliable witnesses they are often most satisfactory evidence."

In Instruction No. 22, above-stated, we have italicized the parts of it of which defendant particularly complains. He contends that these parts invade the province of the jury and infringe upon its exclusive right to pass upon the weight and cred-

ibility of the evidence. In State v. Bittner, 209 Iowa 109, 114, 115, 227 N.W. 601, 603, there was a similar "confession", which the court referred to as "statements or confessions of fact." The court's instruction thereon does not appear in full in the printed report, but an examination of the abstract in that appeal shows that Instruction No. 22 in the case at bar was a substantial duplicate of Instruction No. 16 in the Bittner case, of which this court in affirming the judgment said: "The trial judge, in the instant case, must have had before him the opinion in State v. Brown, 48 Iowa 382. The declared law of the case, supra, is still the law of Iowa. The trial court, in the instant case, properly guarded the defendant in every respect relative to the facts which tended to show his guilt of the crime charged."

In the latter case, 48 Iowa on pages 383, 384, the court said: "* * * and the court instructed the jury in these words: 'When it is shown that a public offense has been committed, free and voluntary confessions of guilt, or of facts necessarily tending to show his guilt, by the party accused, are, by the law, presumed to be true, and are entitled to the highest credit and greatest weight as evidence of such fact or facts; but such confessions will not warrant a conviction, unless they are accompanied by other evidence that the crime has been committed.' * * * The instruction given by the court upon this subject, when considered in the light of the facts of the case, was correct. The evidence, without conflict, showed a free and voluntary confession of the crime, with all its particulars. In such cases the confession is entitled to the highest credit and greatest weight as evidence. Wharton's American Criminal Law, 313; 1 Greenleaf on Evidence, §215."

In criticism of Instruction No. 22, defendant cites State v. Willing, 129 Iowa 72, 75, 76, 105 N.W. 355, 356. In that opinion the court disapproved of an instruction, stating that evidence of admissions of defendant understandingly made, and correctly remembered by witnesses who substantially repeated them as witnesses, was "entitled to great weight." The writer of the opinion, overlooking State v. Brown, supra, 48 Iowa 382, stated: "Our attention is called to no precedent among our cases for thus determining the weight of evidence as a matter of law, and we are not disposed to establish one."

State v. Willing has never been referred to by this court on that point. The latest pertinent prior opinion of this court, State v. Bittner, supra, did not cite State v. Willing, but did announce that the law as stated in State v. Brown, supra, "is still the law of Iowa." We are not disposed to depart from that ruling. It has the support of sound and respected authority. The weight to be given confessions is discussed in 22 C. J. S., Criminal Law, section 843, pages 1479, 1480. It is noted that there are three different theories. One being that confessions freely and voluntarily made are "entitled to the highest credit and to great weight." Other authorities have gone to the other extreme. The author states: "In this connection it is held that, while evidence of confessions should be received and scanned with caution, the confessions themselves, when freely made and satisfactorily proved, are among the most effectual proofs in the law." In support of the text the following authorities are cited: Hopt v. People of the Territory of Utah, 110 U. S. 574, 584, 4 S. Ct. 202, 207, 28 L. Ed. 262, 267—"A confession, if freely and voluntarily made, is evidence of the most satisfactory character. Such a confession, said Eyre, C. B., King v. Warickshall, 1 Leach 263, 'is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and, therefore, it is admitted as proof of the crime to which it refers.'" People v. Popescue, 345 Ill. 142, 159, 177 N.E. 739, 746, 77 A. L. R. 1199—"Voluntary confessions are the highest proof known to the law." People v. Pantano, 239 N. Y. 416, 146 N.E. 646 (A statement voluntarily given, the guilt of the defendant was conclusively established). Anderson v. United States, 6 Cir., Tenn. 124 F.2d 58, 65 (quoting excerpt from Hopt v. People of the Territory of Utah, supra). The People v. Fox, Cal. App., 148 P.2d 424, 432—"While it is elemental that testimony of detectives and officers must be scrutinized, it is also fundamental that a voluntary incriminatory admission or confession of guilt is one of the strongest evidences possible against a prisoner." (Opinion on Rehearing, 25 Cal.2d 330, 153 P.2d 729.) People v. Thomlison, 400 Ill. 555, 561, 81 N.E.2d 434, 437—"A voluntary or freely made confession of guilt is proper evidence of a high and convincing character." People v. Hall, 413 Ill. 615, 624, 110 N.E.2d 249, 254—"A voluntary confession by a com-

petent person of the guilt of a crime is the highest type of evidence." State v. Neff, 169 Kan. 116, 130, 218 P.2d 248, 261—"It is also argued the instruction placed too great emphasis upon the fact a confession was a statement against interest. That is precisely what a confession freely and voluntarily made is. Such a confession is evidence of the most satisfactory character and is deserving of the highest credit." State v. Grass, 223 N. C. 31, 33, 25 S.E.2d 193, 194—"A free and voluntary confession by one guilty of a crime affords testimony of the highest credibility." State v. Rogers, 216 N. C. 731, 6 S.E.2d 499, 500; Rowe v. State, 243 Ala. 618, 11 So.2d 749; Commonwealth v. Kauffman, 94 Pa. Super. 419; Commonwealth v. Carluccetti, 369 Pa. 190, 203, 85 A.2d 391, 396, 397—"Ordinarily, a voluntary confession is entitled to great weight." Commonwealth v. Blanchard, 345 Pa. 289, 291, 26 A.2d 303, 304, 305, 27 A.2d 48—"* * * once it is established that a confession was freely made it is not, as defendant's counsel suggests, the weakest, but, on the contrary, the strongest evidence of guilt." State v. Hoffses, 147 Maine 221, 226, 85 A.2d 919, 921—"* * * 'a deliberate and voluntary confession, understandingly made, is the best evidence.' "

In State v. Bennett, 143 Iowa 214, 218, 220, 121 N.W. 1021, 1023, this court passed on an instruction, which stated: " 'Evidence of a confession should be examined by you with care, but confession, if shown to have been voluntarily made uninfluenced by any threat or promise, is entitled to great weight' ", and said of the instructions as a whole, that they "were quite as favorable to defendant as the law warrants." See also State v. Jackson, 156 Iowa 588, 596, 137 N.W. 1034, State v. Johnson, 72 Iowa 393, 34 N.W. 177, and Martin v. Town of Algona, 40 Iowa 390.

The jurors were definitely instructed that "it is for you, and you alone, to determine what weight shall be given to * * * such confession of facts." We find nothing in the instructions, as a whole, or singly, to confuse or mislead the jury on this point. There is no merit in this assigned error.

III. Defendant assigned error on the admission of certain testimony as rebuttal. The most important part of Anna Belle's testimony related to the claimed accidental shooting.

The witness Eckard, in rebuttal, testified to a conversation with Anna Belle while she was in the hospital on August 9, 1952. To the question as to what they talked about, objection was made that it called for hearsay and was not binding on defendant. The court said: "It will be overruled at this time. I can't tell what this is going to be." The answer was: "We talked about placing guards up there [the hospital], and she wanted them placed because she said she was scared of Baker, that he would come back and kill her."

Two other witnesses, Mulhall and Ross, who were special agents of the Federal Bureau of Investigation, talked with Anna Belle at the hospital on August 15, 1952, about the shooting. To the question to Mulhall as to what she said, defendant objected that it called for hearsay and was not binding on defendant, and irrelevant and immaterial. The objection was overruled. She narrated briefly that defendant came into the bedroom and called her a "profane name" and then shot her while he stood at the foot of the bed.

The question, objection, ruling, and answer with respect to the witness Ross were the same as noted with Mr. Mulhall, supra.

The questioning of these rebuttal witnesses took place in the forenoon. After the noon recess, the court told the jury that in order that there would be no misunderstanding about the admission of testimony of the witnesses Eckard, Mulhall and Ross it was admitted "for what bearing it might have, if any, upon the credibility of the witness Anna Belle Baker, and for that sole and only purpose, and you will consider it solely for that purpose and for no other purpose whatsoever."

Defendant did not challenge this testimony as not being rebuttal. At the close of all the testimony and the State had rested after rebuttal, the defendant moved to strike the rebuttal testimony for the reasons urged in the objections to its admission, "and for the further reason that the same was not offered for the purpose of questioning the credibility of the witness Anna Belle Baker when offered, and for the additional reason that the same was extremely prejudicial, and the jury was not cautioned with reference to the same for a matter of an hour or so afterward." The court said: "Immediately following the testimony of the above named witnesses a recess was taken, and

the jury were excused under the usual caution. Upon resuming trial in this case, the jury were then immediately orally instructed with reference to such testimony. The defendant's motion to strike is overruled."

The court also gave a written instruction embodying the oral direction to the jury. The argument on this assigned error in this court is that there was no proper foundation for the impeaching rebuttal testimony by calling the same to the attention of Mrs. Baker. No such objection was made to the testimony when it was offered. Had it been timely made the objection might have been readily met. We find no merit in this assigned error.

IV. Defendant assigns two other errors which will be considered together. Defendant, in his motion for new trial, charged that one of the women jurors called attention to the fact that one of the witnesses had mentioned a "woman who had that hotel in Des Moines that was in that mix-up, and that she [the juror] knew this woman from away back, and could tell you lots about her", and that her husband covered Spirit Lake and vicinity in his sales work and knew all about the Baker deal, "and told her." Defendant contended in his motion that these remarks influenced other jurors to his prejudice, and that the court erred in overruling his motion for new trial. Four women jurors made affidavits stating in substance that the comments about "that woman" could have and might unknowingly have had an influence on their willingness to go along with the others in the verdict as rendered, and that they had not been satisfied with their action as a jury.

We find nothing to reasonably justify any juror in presuming that the woman gossiped about had the slightest connection with anything involved in the action on trial. Her name was mentioned only in the most incidental way, having no bearing upon the guilt or innocence of the defendant. The affidavits, made a part of the motion for new trial, indicated an indecisive basis for the affiants' feeling about the verdict. Each affiant had serious and reasonable doubt whether her joining in the verdict was influenced by this matter. The affidavits apparently were prepared for presentation to the jurors. They were sworn to before one of defendant's attorneys, a notary. Two of

the affidavits were alike in content. The other two affidavits were alike, but were worded differently from the other pair. In two of the affidavits it was stated that the affiants "were not able to say to what extent" they were influenced.

The matter of the impeachment of jury verdicts by affidavits of the members of the jury has been before this court many times. We have been disposed to concede to the trial court, because of his more advantageous position, a large discretion in passing on such issues in motions for new trials. Methods to induce jurors to impeach their verdicts are sometimes open to censure, and all attempts should be carefully examined. As said by Weaver, C.J., in Ayrhart v. Wilhelmy, 135 Iowa 290, 294, 112 N.W. 782, 783: "If every bit of gossip or irrelevant statement or conversation which finds expression in a jury room is sufficient to vitiate a verdict, few, if any, would be permitted to stand against attack by the unsuccessful party."

The deliberations of jurors, their reasons and arguments, what influenced or induced them in reaching a final conclusion, all inhere in that verdict, and it cannot be nullified or impeached by affidavits of jurors with respect to those matters. We have many times so held. State v. Kirk, 168 Iowa 244, 256, 257, 150 N.W. 91; State v. Warren, 242 Iowa 1176, 1190, 47 N.W.2d 221; State v. White, 205 Iowa 373, 376, 217 N.W. 871; State v. Dudley, 147 Iowa 645, 652, 653, 126 N.W. 812; State v. Werling, 234 Iowa 1109, 1112, 1113, 13 N.W.2d 318; State v. Gregory, 198 Iowa 316, 324, 325, 198 N.W. 58; State v. Cox, 240 Iowa 248, 254, 255, 34 N.W.2d 616; State v. Hill, 239 Iowa 675, 683, 684, 32 N.W.2d 398; State v. Rand, 170 Iowa 25, 31–33, 151 N.W. 1078. The affidavits of the jurors were rightly disregarded in passing upon and in overruling defendant's motion for a new trial.

We are satisfied that defendant had a fair trial, without prejudicial error, and that a just judgment was entered. It is affirmed.—Affirmed.

GARFIELD, C.J., and OLIVER, WENNERSTRUM, SMITH, HAYS. THOMPSON, and LARSON, JJ., concur.

MULRONEY, J., concurs in result.