The People of the State of Illinois, Plaintiff-Appellant,
v. Morris Randall Pruitt, Defendant-Appellee.
The People of the State of Illinois, Plaintiff-Appellant, v.
Esther Pruitt, Defendant-Appellee.

Gen. Nos. 66–37, 66–38.

Second District.

February 2, 1967.

 █

Henry S. Dixon, State's Attorney, of Dixon, for appellant.

Gunner and Keller, and Tomas M. Magdich, of Dixon, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

This appeal involves two cases—consolidated for trial—in which each defendant was indicted for the offense of the possession of burglary tools. (Ill Rev Stats 1965, c 38, § 19–2.) The defendants moved to suppress the alleged burglary tools on the ground that they were discovered in an unlawful search of the personal effects of the defendant, Esther Pruitt, without her consent and without a search warrant, when neither defendant was under arrest; and that the arresting officers, at such time, had no reasonable grounds to believe that either defendant was committing or had committed an offense. The trial court, after hearing, found that the evidence failed to establish that the arresting officers had reasonable grounds to believe that an offense had been committed; that the arrests of the defendants were unlawful; that the searches were void; and ordered that such burglary tools be suppressed from being used as evidence against the defendants at the trial. The State appealed from this order.

Reverend George Curran, pastor of St. Paul's Lutheran Church of Dixon, and police officers Camery and Dusing testified at the hearing on behalf of the defendants. Each was cross-examined by the State, and officer Camery testified for the State. A fair appraisal of their testimony indicates that the police officers received a call at about 1:25 p. m., on Sunday, March 28, 1965, to come to St. Paul's Church right away. Upon arrival, the officers talked to Mrs. Stiles, the Church secretary, who told them that a theft had been committed at the morning service; that the bottom of a money bag had been cut and about $100 in bills had been taken; that when she returned to the Church after lunch, she saw somebody running in the hall and at the same time "saw a man in my locked office kneeling down at the safe . . ."; that the safe was open; that the two persons whom she had seen were then with Reverend Curran in the study. She also showed the mutilated money bag to the officers. Before calling the police, Mrs. Stiles had called Reverend Curran, who, along with his associate pastor, came immediately to the Church.

After the morning service the Church proper was locked, but the Tower door entrance to the Church remained unlocked and this entrance led to the hallway, the Church office, the study and certain other rooms.

The defendants, husband and wife, who had an infant child with them, and Reverend Curran were in the study for about five minutes before the police arrived.

Mr. Pruitt told Reverend Curran that he desired information concerning employment in the Dixon area.

The police, after talking with Mrs. Stiles, went to the study to question the defendants. They told the Pruitts that they considered them suspects of an offense and that they would have to come to the police station with them. Following this statement the Pruitts made no protest, either verbally or physically, until the officers later

started to place handcuffs on Mr. Pruitt, and at that time they resisted, but went with the officers. The officers then asked the defendants about their present and prior addresses, and questioned Mr. Pruitt concerning his employment.

The officers also made a perfunctory search of the defendants which began by requesting each of them to produce an identification. Mr. Pruitt complied by giving the officers his billfold, which they searched. It established his identity, and the officers returned it to him. Mrs. Pruitt stated that she had no identification. One officer asked her what she had in her purse and she replied that she didn't like to have people going through her personal things. When the officer insisted on some identification, she pushed her purse toward him—a push which Reverend Curran characterized as reluctant—and upon examination of its contents, the officers found six items described as burglary tools. These searches were made without a search warrant. Under our decision, we need not decide whether Mrs. Pruitt consented to this search.

After the defendants were placed in jail, the officers searched the Pruitt car, which was parked near the Church, and found another homemade tool, described as a burglary tool, and a paper bag filled with coins. This search was likewise made without a warrant.

Reverend Curran, who did not remember whether he informed the defendants that he suspected them of some wrongdoing, did recall that the police officers asked the Pruitts to come with them after the contents of the purse had been laid upon the table. He stated that at such time one of the officers said, "This is evidence enough." It was also his recollection that Mrs. Pruitt carried the baby into the study; and Mr. Pruitt, the purse.

However, both police officers testified that upon entry into the Church study they informed the defendants

that they were suspects of a crime and would have to come to the police station with them. This testimony was not refuted. The officers also testified that they arrested the Pruitts prior to searching Mrs. Pruitt's purse; and that they did so upon entering the Church study by making the aforesaid statement to the defendants.

This factual background presents for our determination the issues of whether the arresting officers, who had no warrants for the arrest or search of the defendants, had reasonable grounds to believe that the defendants had committed or were committing an offense as required by section 107–2(c) of the Code of Criminal Procedure (Ill Rev Stats 1965, c 38, par 107–2(c)), and if so, had the officers effected an arrest of the defendants prior to or at the time they searched them as required by section 107–5(a) (Ill Rev Stats 1965, c 38, par 107–5(a)); and were such searches proper under the provisions of section 108–1 of said Code (Ill Rev Stats 1965, c 38, par 108–1), which provides:

> "Search without Warrant] When a lawful arrest is effected a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of:
>
> (a) Protecting the officer from attack; or
> (b) Preventing the person from escaping; or
> (c) Discovering the fruits of the crime; or
> (d) Discovering any instruments, articles, or things which may have been used in the commission of, or which may constitute evidence of, an offense."

 Section 114–12 of the Code sets forth the procedure to be followed in bringing before the court the issue of suppressing evidence alleged to have been illegally seized. (Ill Rev Stats 1965, c 38, par 114–12.) We believe this issue was properly presented to the trial court, and recognized that since Mapp v. Ohio, 367 US

643, 6 L Ed2d 1081 (1961), unreasonable searches and seizures are violative of the Fourteenth Amendment to the United States Constitution; and that the Illinois law in regard thereto in the final analysis, is thereby federalized.

█ The threshold issue here is whether the arrest of the Pruitts was lawful, and this is to be determined by whether the police officers had reasonable grounds to believe that the Pruitts were committing or had committed an offense. The People v. Zazzetta, 27 Ill2d 302, 310, 189 NE2d 260 (1963); The People v. Galloway, 7 Ill2d 527, 534, 535, 131 NE2d 474 (1956).

Particular attention must be given to section 107-2(c) of the Code of Criminal Procedure which authorizes a peace officer to arrest a person when "He has reasonable grounds to believe that the person is committing or has committed an offense." This provision does not require that the officer know that an offense has in fact been committed. (See: Committee Comments, SHA ch 38, § 107-2; and Arrest and Arrest Alternatives, The University of Illinois Law Forum, Vol 1966, Summer, Number 2, pages 244-246 incl.)

█ In The People v. Galloway, supra, the court stated at page 535:

"The belief induced in the mind of an officer must be a reasonable belief and must appear on subsequent inquiry to have been founded on such facts as would, in the mind of a reasonable man, give rise to a suspicion that the prisoner is guilty of or implicated in a crime. A mere suspicion in the mind of an officer not so supported will not justify a search."

In other cases the Illinois courts have construed the reasonable grounds test of the Code quite liberally. In The People v. McCracken, 30 Ill2d 425, 197 NE2d 35 (1964), the defendant, who was a known offender to the police, was seen carrying certain articles in a location

where several thefts had occurred. When he saw the police, he attempted to flee and was then arrested. In The People v. Jones, 31 Ill2d 42, 198 NE2d 821 (1964), Jones, who appeared to be a narcotics addict, was seen walking in an area where a burglary had recently occurred, in possession of goods similar to those reported to have been stolen. And, in The People v. Garrett, 49 Ill App2d 296, 200 NE2d 7 (1964), Garrett, who appeared unkempt, was seen in an area, where a burglary had been committed, carrying a large item from a recently burglarized building. In all of these cases, the court found that the arresting officers, who had no warrant, had reasonable grounds to believe that the parties in question had committed or were committing an offense.

In The People v. Cain, 35 Ill2d 184, 220 NE2d 195 (1966), the court stated, at pages 186 and 187:

"In determining whether reasonable cause exists in a particular case the court deals with probabilities and must act upon practical considerations of everyday life. (People v. La Bostrie, 14 Ill2d 617.)"

And, in People v. Garrett, supra, the court stated at pages 299 and 300:

"Reasonable cause for an arrest does not require the same quantum of evidence necessary to support a conviction. This principle was first stated by Chief Justice John Marshall in Locke v. United States, 7 Cranch 339, 3 L Ed 364 and reaffirmed in Brinegar v. United States, 338 US 160, 175. Reasonable cause may also be founded upon evidence that would not be admissible at the trial. Brinegar v. United States, 338 US 160; United States v. Heitner, 149 F2d 105, 106. The test is whether a reasonable and prudent man in the possession of the knowledge which has come to the arresting officer would believe the person arrested is guilty of a criminal offense. Husty v. United States, 282 US 694; People v. La Bostrie,

215

14 Ill2d 617, 622, 153 NE2d 570; People v. Jones, 16 Ill2d 569, 574, 158 NE2d 773; People v. Fiorito, 19 Ill2d 246, 166 NE2d 606."

Also see: The People v. Zeravich, 30 Ill2d 275, 195 NE2d 612 (1964); and People v. Tadlock, 59 Ill App2d 481, 208 NE2d 100 (1965).

These principles have been proclaimed by the United States Supreme Court in Ker v. California, 374 US 23, 35, 36, 10 L Ed2d 726, 739 (1963); and in Draper v. United States, 358 US 307, 310–312 incl., 3 L Ed2d 327, 330, 331 (1959). In Draper, in pointing out the difference in proof required to establish guilt and probable cause, the court stated at page 332:

> " 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, supra (338 US at 175). Probable cause exists where 'the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 US 132, 162, 69 L Ed 543, 555, 45 S Ct 280, 39 ALR 790."

This subject was also aptly discussed in The People v. Jones, supra, at page 47, where the court noted that, ". . . it has been observed that police officers 'often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.' People v. Watkins, 19 Ill2d 11, 19."

We further believe that the arrests were made when the officers entered the study and informed the Pruitts

that they were suspects of a crime and would have to come to the police station with them. This was prior to the search of the Pruitts and the discovery and seizure of the alleged burglary tools. Section 107-5(a) of the Code of Criminal Procedure, supra, provides:

"An arrest is made by an actual restraint of the person or by his submission to custody."

We believe that the officers' statement to the Pruitts constituted an actual restraint of their person and, in addition, that the Pruitts then and there submitted to such custody. It was only at a later time—after the search revealed the tools, described as burglary tools,—that they made any protest or resistance to the existing restraint by the officers.

In People v. Mirbelle, 276 Ill App 533, 541, 542 (1934), the court defined an arrest as consisting of authority, intention and restraint of the person. The intention to make an arrest must be understood by the person arrested and the restraint or detention must be actual. However, such actual restraint is effected when the party is brought within the power of the officer; and there need be no actual force or manual touching of the body of the person arrested. When these three elements exist, or when the parties, to whom words are spoken indicative of an arrest, submit, the arrest is accomplished. Such were the circumstances in the case at bar.

The defendants had no reason, consistent with propriety, to be in the Church at a time when services were not in session and the building was locked—except for the Tower door which admitted persons into a corridor, off which the Church office, study and other similar rooms were located. A person who enters a church for a legitimate purpose does not normally do so at a time when services are not being conducted and when the church is unattended; and he does not customarily seek out the church office, gain access to it through a door

217

which was locked, then proceed to kneel before and examine the contents of its safe. Neither does such person flee through the hall when the church secretary enters the church.

It taxes our credulity to believe that such kneeling was for a prayerful purpose or that such entry into the Church was for the purpose of discussing employment. In addition, if the purpose was proper, why did Mrs. Pruitt flee through the hall when Mrs. Stiles entered the Church?

█ When informed of the theft after the morning services and of the circumstances herein related, we believe that the officers had adequate information to afford them reasonable grounds to believe that the defendants had committed or were committing an offense.

In view of this determination, we find that the search of the defendants, and the area in their immediate presence, in the Church study, after their arrest, was proper; that the tools, designated as burglary tools, found in Mrs. Pruitt's purse and subsequently seized by the police, were erroneously suppressed; and that the court erred in entering an order denying their admission in evidence against the defendants at the trial.

██ We recognize that when an arrest is unlawful, the subsequent discovery of evidence does not relate back to and operate as a justification for the arrest (The People v. Galloway, supra, 535), but we find no basis for the application of this rule under our findings in respect to the lawfulness of the arrest and the sequence of the arrest and the search. Where the arrest is justified, the accompanying search without a warrant is also justified, and evidence taken from the person as a result of that search, if otherwise competent and relevant, is admissible, against the party or parties searched and charged with the offense. The People v. Boozer, 12 Ill 2d 184, 187, 188, 145 NE2d 619 (1957).

218

Section 108–1 of the Code of Criminal Procedure, subsection (a), (b) and (c), lists the heretofore traditionally recognized purposes of a lawful search of a person and the area within such person's immediate presence. However, subsection (d) thereof recognized the further right to make such search, under proper circumstances, for evidence of an offense. Thus, pursuant to subsection (d), the officers could legally search the Pruitts to discover instruments, articles, or things which may constitute evidence of an offense. And, thereunder, the search would be a reasonable one even though it was not restricted to evidence directly related to the offense for which the arrest was made. See: Committee Comments, SHA ch 38, § 108–1.

However, there is no basis under which the propriety of the search of the Pruitts' car can be sustained. It was made after the Pruitts were lodged in jail. It was totally unnecessary for any of the reasons specified in section 108–1, and, in addition, the evidence does not establish that it was within the area of the Pruitts' immediate presence. The People v. McGhee, 35 Ill2d 302, 304, 305, 220 NE2d 205 (1966); The People v. Gates, 35 Ill2d 584, 585, 221 NE2d 285 (1966).

Consequently, the Order of the trial court suppressing the evidence as to the homemade tool, designated as a burglary tool, and as to the paper bag of coins found in the search of the Pruitts' car, is affirmed; and the Order reversed as to the items designated as burglary tools, which were found in Mrs. Pruitt's purse. Such items were found and seized in the process of a lawful search and no constitutional prohibition exists with reference to their admission in evidence against the defendants at the trial of this case.

Affirmed in part, and reversed and remanded in part with directions.

MORAN, P. J. and SEIDENFELD, J., concur.