STATE OF IOWA, appellee, v. JOANNE RYE, appellant.

No. 52088.

(Reported in 148 N.W.2d 632)

February 7, 1967.

Gill & Huscher, of Des Moines, for appellant.

Lawrence F. Scalise, Attorney General, Ray Fenton, County Attorney, of counsel, and Craig Sawyer, all of Des Moines, for appellee.

Snell, J.—Because a rehearing was granted the former opinion herein, reported in 145 N.W.2d 608, is withdrawn and the following substituted therefor.

Defendant was convicted of larceny of property having a value in excess of $20 and was sentenced to five years imprisonment in the women's reformatory. She appeals the jury verdict and judgment on several grounds.

Two plainclothes detectives of the Des Moines police force were on duty in an unmarked police car Friday morning, August 6, 1965. They received a report from the police radio dispatcher that a black suit had been taken from Herman Kucharo's Men's Store. The suspects were reported as two women, one wearing a blonde wig, who were reported to have gotten into a car driven by an unidentified third person. The license number was given to the officers. They knew the type of car they were to look for, the owner of the car and his address all from previous experience with the owner.

The officers found the car about 15 minutes later. They followed it to the owner's home where it pulled to the curb, coming almost to a complete stop. The car was being driven by a man and had two women passengers. As the unmarked police car pulled up the car sped away at a high rate of speed. The officers followed. The car then stopped after being told to pull over. As the car was being followed after speeding away, the two women passengers were observed passing garments between

them in what the officers described as an abnormal way. The garments were not in shopping bags or other containers.

When the car was stopped the officers approached it. The driver, Richard Evans, was asked why he was trying to get away. He shrugged his shoulders and said he did not know. The officers could see into the car. Defendant was sitting in the rear on the passenger's side. She had a black purse in her lap that bulged, part of a garment was sticking out of the purse. The other lady also had a handbag with garments sticking out of it. A blonde wig was in defendant's lap. The officers also saw a suede coat with a mink collar on it which was between the two women and in defendant's hand. They also saw a white pillowcase on the floor of the back seat between defendant's feet. A mink stole was in the pillowcase. No man's suit was seen at this time nor was any such suit ever found.

The occupants of the car were told to get out, that they were going to the police station for shoplifting. Other articles were found in the car coincidental to this arrest.

I. Defendant predicates several errors on the assertion that the arrest was illegal. This contention should be first examined. Defendant's position is that the arrest here was made and was actually complete when the car was ordered by the officers to stop and actually did stop in compliance with that order. The State does not concede this proposition but states that the point makes no difference as the officers had sufficient information for a legal arrest both when they ordered the car to stop, and when they ordered the people out of the car.

We are not prepared to hold that every order to stop by a policeman to the driver of a moving vehicle, is, when obeyed, an arrest of all of the occupants of that vehicle. This problem has been examined in detail in several United States Supreme Court cases. A close look at the facts and the holdings indicates that the moment when arrest is made depends upon the facts of each case.

The cases recognize that officers do not have an absolute right to stop automobiles for investigation on mere whim or mere suspicion. Each case, under the circumstances reviewed, found that the officers had probable cause to stop the vehicle and

that the arrest occurred after other suspicious circumstances added additional reason for probable cause for the subsequent arrest.

Under the circumstances shown here we hold that the actions of the officers in stopping the car in which defendant was riding were taken on probable cause, and the subsequent formal arrest after seeing the clothing in the automobile met the statutory requirement of Code, 1966, section 755.4(3) ; i.e., that the officers had reasonable ground to believe that an indictable public offense was committed and that the person to be arrested had committed it.

The fact that the initial cause for stopping defendant was the report of theft of a man's suit and that such a suit was never found, much less connected to defendant, does not vitiate the proceedings. In State v. Freeland, 255 Iowa 1334, 125 N.W. 2d 825, the initial stopping was because the license plate was painted over and there were recent breakins in the vicinity; in Henry v. United States, 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed.2d 134, the fact that officers were looking for stolen whiskey but found stolen radios was not determinative.

II. The State called two employees of Wolf's store to testify as to the garments offered in evidence. To summarize : they were both buyers, Ruth Gesland in sportswear and Beatrice Best in suits, coats and furs; they detailed the store's procedure as to pricing, inventory control, use of tickets on garments, sales by cash or by credit, use of cash register when sales were made and other details of the store's customary practices. Ruth Gesland testified that exhibits A, B, C and D all had three-part perforated tickets on them. One part of the ticket is customarily torn off when the garment is sold. These tickets are checked daily as part of the inventory control. The third part was intact on all four items when recovered and in court. She had personally hung Exhibit D on the rack at Wolf's at 9 :30 the morning of the arrest. She also testified that she had checked the cash register. As to the gray three-piece wool suit she was then allowed to state of her own personal knowledge that the dress had not been sold.

Beatrice Best testified that it was her responsibility to maintain inventory. That she had seen the mink fur in question the morning of the arrest and detailed the procedures in connection with recording the sale of such a fur. She then testified that she knew of her own knowledge that this fur had not been sold. The two witnesses testified as to the retail and wholesale prices of the various items. All prices exceeded $20. Total retail price of all items came to some $542.43.

Defendant strenuously objects to all of this testimony stating that the testimony as to inventory, sales tickets and marking procedure, bookkeeping and inventory control calls for the opinion and conclusion of the witness without proper foundation, that the best evidence is the records themselves, that the testimony assumed facts not in evidence and that it was hearsay as to defendant. As to the opinion and conclusion evidence in relation to company practices, the objections were clearly without merit. The foundation established these two witnesses as regular employees of Wolf's, their duties included the very practices and procedures outlined by the witnesses and their testimony established the fact that they were familiar with both the merchandise and the method of the store's handling of that merchandise.

The most serious objection by defendant goes to witness Gesland's answer to the following question.

"Q. Of your own personal knowledge as buyer of this department and as a result of searching the records, do you know whether or not this particular garment Exhibit 'D' was sold on August 6, 1965?"

Objection made by defense counsel.

"A. I do the unit control books—I check the cash register, the dress had not been sold."

■ A properly qualified witness may orally testify to a search of books or records and to the fact that such search fails to reflect a certain transaction. In re Estate of Colton, 129 Iowa 542, 546, 105 N.W. 1008, "We think the negative sought to be established may be proven like any other fact; that is, by one possessing the necessary information." Under the circumstances here it would not be necessary to produce the records of Wolf's.

152

See also Cohen v. Boston Edison Co., 322 Mass. 239, 76 N.E.2d 766, and McCormick, Evidence, section 198, page 411.

■ Here the witness' knowledge of the merchandise and the pertinent records qualified her to testify to the negative fact that the item had not been sold. This was equally true of the fur buyer's testimony even though under a similar but different system of control, she did not testify to having checked the cash register. The probative value of this testimony was for the jury.

■ III. Defendant also predicates error on the court's instruction No. 9 which told the jury that possession of property recently stolen is evidence from which an inference may be drawn that the person or persons in whose possession it is found are guilty of larceny thereof. Defendant argues that this instruction should not have been given because there was no evidence that the stolen property was in defendant's exclusive possession. Suffice to note that there was testimony from which the jury could find that Exhibits A and D were taken from defendant's purse and the mink stole was in a pillowcase between defendant's feet. The evidence of possession was sufficient to justify the instruction.

Defendant requested no instructions amplifying instruction No. 9. The instruction as given adequately covers the subject in the absence of additional specific request for elaboration. See State v. Baker, 246 Iowa 215, 66 N.W.2d 303.

■ IV. Defendant's fourth area of complaint concerns the testimony of the officers as to certain statements and admissions made at the police station immediately after the arrest.

At the scene of the arrest defendant's companion informed the police that she did not have to say anything and told defendant not to say anything. At the station all three parties were told that they did not have to say anything and were asked if they had an attorney. At one point Detective Spencer said in answer to a question as to what he said when he advised the parties of their rights, "A. That they didn't have to tell us anything without counsel which they already knew." The latter portion was properly stricken as a conclusion.

On voir dire before trial on Motion to Suppress, Detective Thompson stated: "My advice as to their rights was substantially that they didn't have to say anything and asked them if they had an attorney. This was the advice given the defendants at the Detective Room at the table."

Detective Thompson's trial testimony was: "They were told they didn't have to tell us anything and they were also asked if they had an attorney. They said, 'No'. They were asked if they wanted to tell us about these things. They proceeded to say they did get these things without paying for them."

In the case before us there is not the slightest suggestion of any force, prolonged questioning, pressure, deceit, subterfuge, coercion, threats, promises or even persuasion. There was no denial of any right.

It is undisputed in the record that defendant was repeatedly advised that she "didn't have to say anything." Defendant and her companion "were asked if they wanted to tell us about these things." The officers testified as to what was then said. The statements of defendant as reported were voluntary and were admissible at the time this case was tried. State v. Fox, 257 Iowa 174, 131 N.W.2d 684; State v. Tharp, 258 Iowa 224, 138 N.W.2d 78; State v. Mabbitt, 257 Iowa 1063, 135 N.W. 2d 525; State v. Leiss, 258 Iowa 787, 140 N.W.2d 172; State v. Myers, 258 Iowa 940, 140 N.W.2d 891; State v. Miller, 259 Iowa 188, 142 N.W.2d 394.

This case was tried in November 1965 and defendant was sentenced November 29, 1965.

On June 13, 1966, Mr. Chief Justice Warren, speaking for the Supreme Court of the United States, delivered the opinion of the Court in Miranda v. Arizona, 384 U. S. 436, 478, 86 S. Ct. 1602, 1631, 16 L. Ed.2d 694. The opinion spelled out with considerable specificity the procedure required to make in custody statements and confessions constitutionally admissible. Division III of the opinion concludes as follows:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling

154

influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities * * * and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

The court called attention to Malloy v. Hogan, 378 U. S. 1, 84 S. Ct. 1489, 12 L. Ed.2d 653, holding that the substantive standards underlying the privilege apply with full force to state court proceedings.

In the case at bar the State concedes that the record does not show that defendant was effectively apprised, under the standards promulgated in Miranda, of her right to counsel or of

the included right to have counsel present during interrogation. It appears, however, that defendant did not request counsel during interrogation, nor did the officers deny any attorney access to defendant during the interrogation. The record also clearly demonstrates that the statement made by defendant and later admitted over the sufficient objections of defense counsel was voluntary in nature; that is, such statement was not a coerced confession. The record also demonstrates that defendant did not waive her right to counsel, in the sense that waiver has been defined with regard to traditional constitutional rights.

The case before us is not factually comparable to, controlled by or violative of the principles announced in Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed.2d 977. Our problem is whether the case is controlled by Miranda.

On June 20, 1966, one week after the decision in Miranda, the Supreme Court, Mr. Chief Justice Warren, again speaking for the Court, in two cases, considered whether Miranda should be accorded retroactive application. In Johnson v. New Jersey, 384 U. S. 719, 721, 86 S. Ct. 1772, 1774, 16 L. Ed.2d 882, the court in the first paragraph said:

"In this case we are called upon to determine whether Escobedo v. Illinois, 378 U. S. 478 (1964), and Miranda v. Arizona, should be applied retroactively. We hold that Escobedo affects only those cases in which the trial began after June 22, 1964, the date of that decision. We hold further that Miranda applies only to cases in which the trial began after the date of our decision one week ago. The convictions assailed here were obtained at trials completed long before Escobedo and Miranda were rendered, and the rulings in those cases are therefore inapplicable to the present proceeding."

In that case the defendants had far more basis for complaint than does the defendant in our case and the penalty was extreme but the court refused to interfere.

In Davis v. North Carolina, 384 U. S. 737, 739, 86 S. Ct. 1761, 1763, 16 L. Ed.2d 895, the court said:

"Had the trial in this case before us come after our decision in Miranda v. Arizona we would reverse summarily. Davis was

taken into custody by Charlotte police and interrogated repeatedly over a period of 16 days. There is no indication in the record that police advised him of any of his rights until after he had confessed orally on the 16th day. This would be clearly improper under Miranda. Similarly, no waiver of rights could be inferred from this record since it shows only that Davis was repeatedly interrogated and that he denied the alleged offense prior to the time he finally confessed.

"We have also held today, in Johnson v. New Jersey, that our decision in Miranda, delineating procedures to safeguard the Fifth Amendment privilege against self-incrimination during in-custody interrogation is to be applied prospectively only. Thus the present case may not be reversed solely on the ground that warnings were not given and waiver not shown."

In that case an impoverished Negro with a third or fourth grade education and a low level of intelligence was held in an inside jail cell measuring 6 by 10 feet for 16 days before he confessed. Neither friend nor relative saw him. He was fed two sandwiches "thin" and "dry" twice a day. "This fare was occasionally supplemented with peanuts and other 'stuff' such as cigarettes brought to him by a police officer." He lost 15 pounds during this period of detention. For 16 days he was subjected to police interrogation, tricks and varying tactics to break down his alibi and incriminate himself. He finally confessed.

The Supreme Court said: "The facts established on the record demonstrate that Davis went through a prolonged period in which substantial coercive influences were brought to bear upon him to extort the confessions that marked the culmination of police efforts. * * * Davis' confessions were the involuntary end product of coercive influences and are thus constitutionally inadmissible in evidence. * * *."

It should be noted that the case was reversed for constitutional infringement not appearing in the case before us and that the court specifically refused to reverse on the grounds involved here.

The case before us having been tried prior to the decision in Miranda must be determined under the law as it was at the time of trial.

That state courts need not apply Miranda retroactively as to custodial interrogation see People v. McQueen, 18 N.Y.2d 337, 274 N. Y. S.2d 886, 221 N.E.2d 550.

The case is—Affirmed.

GARFIELD, C. J., and LARSON, MOORE and STUART, JJ., concur.

THORNTON, J., dissents.

BECKER, MASON and RAWLINGS, JJ., dissent.

BECKER, J.—I dissent.

I am indebted to Chief Judge Desmond's dissent in People v. McQueen, 18 N. Y.2d 337, 274 N. Y. S.2d 886, 898, 221 N.E.2d 550, 558 (cited by the majority) for the following: "Unvarying has been our fealty to the rule of the Schooner Peggy case (1 Cranch [5 U. S.] 103, 110, 2 L. Ed. 49 [1801]) where Chief Justice Marshall wrote: 'It is in the general true that the province of an appellate court is only to inquire whether a judgment when rendered was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. * * * In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside'."

We should follow the above rule. As Chief Judge Desmond points out, the plain justice of the matter requires that *current* law be applied to current appellate problems. This does not necessitate application of the rule to cases already disposed of by this court on direct appeal. Hence the point urged by the State in its application for rehearing is effectively answered.

However, this case does not necessitate using the Miranda rules. All we have to do here is follow the pre-Miranda dictates of the Supreme Court of the United States as fairly applied to the facts in this case to conclude that federal constitutional

guarantees have been violated and a new trial is necessary.

It would seem that *on its facts* this case has less to commend it by way of warning than any of the cases heretofore cited as Iowa precedent. It is the point where this court can and should depart from its historic insistence on coercion and duress as the only criteria for voluntary statements and recognize that the federal constitutional requirements are to be enforced by this court whether we like them or not.

The majority states, "The statements of defendant as reported were voluntary and were admissible at the time this case was tried." and cites six recent Iowa cases in support of that case. All of those cases, except State v. Fox were noted and discussed in the former opinion reported in 145 N.W.2d 608. Additional space need not now be used to reiterate what has already been printed (though withdrawn as a majority opinion).

As to State v. Fox, supra, the case is simply not in point. The statements, admissibility of which was challenged by Fox, occurred long after he had an attorney, had talked to his attorney and had been advised by his attorney of his constitutional rights. Factually the cases are so palpably dissimilar that it was thought that the dissimilarities need not be underlined.

This, it now appears, was a mistake. For Fox is one of the first cases in which this court obliquely announced that it would not follow the plain import of the United States Supreme Court's holdings in Escobedo v. State of Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed.2d 977; Carnley v. Cochran, 369 U. S. 506, 82 S. Ct. 884, 8 L. Ed.2d 70; and Malloy v. Hogan, 378 U. S. 1, 84 S. Ct. 1489, 12 L. Ed.2d 653, until required to do so by more stringent language. The language was supplied in Miranda.

This court avoided the clear import of those federal cases in the six state cases cited by the majority. Those cases along with many others from other jurisdictions forced the detail in Miranda.

But in each of our State cases there was (arguably) enough warning so that the majority had some evidence upon which it could build a rationale; "a peg upon which it could hang its hat." Not so here. The record does not support the statement in Division IV that "It is undisputed in the record that de-

fendant was repeatedly advised that she 'didn't have to say anything.' " The most that can be said for this record is that two police officers testified that defendants were told that they "didn't have to say anything." But the only fair conclusion from all the evidence was that this statement was made by the officers only once, although both officers testified as to its having been made. Even under our prior holdings and most certainly under any fair reading of the pre-Miranda U. S. Supreme Court decisions, we should conclude that there was no effective warning given here. The distinction between this case and our prior cases is that some semblance of warning was given in the prior cases. Here we must content ourselves with recognizing the bland statement she "didn't have to say anything" as an effective warning.

The majority states that "The case before us is not factually comparable to, controlled by or violative of the principles announced in Escobedo * * *." This sweeping statement is not accurate. The case is controlled by Escobedo if the constitutional mandates of Escobedo have been violated. It is comparable to Escobedo in that in both cases defendant was questioned by police "without informing him of his absolute right to remain silent in the face of this accusation." It is violative of the principles of Escobedo which (as noted in the Escobedo dissent), "At the very least * * * holds that once the accused becomes a suspect and, presumably, is arrested, any admission made to the police thereafter is inadmissible in evidence unless the accused has waived his right to counsel." That principle is clearly present in the case as recognized by Mr. Justice White. That principle is violated unless we hold (1) that short statement once given "You do not have to talk to us." is a consitutional warning on which waiver can be bottomed or (2) that failure to affirmatively request a lawyer in and of itself constitutes a waiver. This is the basis for the conclusion that this case must be reversed unless we are ready to presume a waiver of constitutional rights from a silent record. By doing that here, we violate the plain mandate of Carnley v. Cochran, supra.

Finally, this case should be reversed because the defendant's constitutional rights have been violated. Independent of the

160

effect of our attitude, which is forcing the Federal Government to make us respect federal constitutional rights, orderly and just procedure demands that convictions be obtained within the framework of the United States Constitution as well as the Iowa Constitution. I would reverse and remand for new trial.

I am authorized to say that JUSTICES MASON and RAWLINGS concur in this dissent.