Hillsborough,
No. 5537.

STATE

*v.*

THOMAS E. HUTTON *& a.*

Argued June 6, 1967.
Decided October 31, 1967.

*George S. Pappagianis,* Attorney General, and *Norman E. D'Amours*, Assistant Attorney General ( *Mr. D'Amours* orally ), for the State.

*Sullivan, Gregg & Horton* and *Charles F. Kazlauskas, Jr.* ( *Mr. James L. Sullivan* orally ), for defendant Thomas E. Hutton.

*Louis P. Faustini* for defendant Roy H. King.

LAMPRON, J.   At about 7:45 P.M. on October 25, 1965, Lionel Gagne and his wife, June, returned by automobile to their home on Montgomery Street in Manchester. As they approached their driveway, June observed a "very light green car with an odd back" parked across the street from their house. Alighting from the passenger side of the car, June heard the horn of that parked car "blowing frantically" and also heard a noise indicating to her that the front door of their house was being either closed or

opened. She then proceeded toward the street where she observed one person in the parked car. While so doing she heard "a very loud whistle" coming from the direction of the Kehas house located directly south of the Gagne home. She turned in that direction and saw two men standing by a hedge at the further end of the Kehas residence. "All I could see was that they had light short coats on, and immediately I started to run from our driveway to Mr. Kehas' driveway to get him, and he had already come out of his house and I met him right there as I crossed."

While standing at that point with Kehas, who is deputy chief of the Manchester police department, June observed the same car, which she had previously seen parked across the street heading in a northerly direction, now proceeding south on the side of the street where she and Kehas were standing. It was "gaining speed rapidly." She noticed the car had a Massachusetts registration plate in the rear. Upon entering her home thereafter, she found the kitchen door open and saw part of its lock on the breezeway floor. "In the bedroom many of the drawers were opened and ransacked, and on the bed was an empty gallon jar that had held quarters and dimes . . . . I know there was money missing from it. It was empty."

Lionel Gagne testified that because of the statement of his wife that somebody was trying to get out of their house, he went to the breezeway door to investigate. As he did he heard a noise. "So I said 'Is anybody here' or something like that. Still as I was just stepping in some voice said 'Hello there,' and which immediately stopped me right there. I didn't know if it was a friend or foe, but as I stopped I heard a swish. Whoever was there ran out the back door."

Deputy Kehas testified that upon hearing a whistle he went outside to investigate and met Mrs. Gagne who told him about the parked car she has observed and the two people standing by a hedge south of his home. As they were talking Mrs. Gagne said "that car is coming now." He saw one male occupant in this light green car, which he identified as a Thunderbird manufactured before 1963 because of its body style, accelerating to a speed of about 40 or 50 miles an hour. It was about 7:50 P.M. He telephoned the police station and reported that "The Gagne home had been broken in; that a Thunderbird, light green, early 1960's was going south on Montgomery Street at a fast rate of speed, Massachusetts registration plate and one male occupant

in the car, and that Mrs. Gagne reported there were two people standing at the hedge south of my house."

About that time, a police officer assigned to a cruiser patroling the West Side of Manchester, where the Gagne home is located, received a radio message, addressed to all cars with special attention to cruisers assigned to the West Side, to be on the lookout for a light green Massachusetts car, possibly a Thunderbird, operated by a male occupant. Approximately 5 minutes later, he observed a vehicle answering this description and proceeded up to it as it was stopped at a red traffic light. As his police car with the blue dome light on approached, he observed the driver in front of him look up in his rear view mirror, accelerate his car and proceed through the red light. A chase ensued during which this car went through another red traffic light and numerous stop signs, and hit another police cruiser. The car finally came to a stop in the driveway of a florist establishment where the driver ran out of the car and was not apprehended. Mrs. Gagne and deputy Kehas later identified the car as the one they had observed near their homes earlier that evening.

The police examined the car and found that the Massachusetts registration plates in the front and in the back did not have the same number. They also noticed that it bore a Massachusetts sticker on the windshield. As a result the police department notified taxi stands and bus stations to be on the lookout for any two persons who might be trying to get back to Massachusetts.

A driver for "LeBlond's Taxi" testified he had received a request from the police department to notify his dispatcher if "we picked up two or three men going to leave town" and to give their destination. At about 10:30 or 10:40 P.M. he was dispatched to a street corner where two men were waiting. He identified them at the trial as the two defendants. Upon boarding the taxi, they asked to be driven to a hotel in Manchester. En route, they inquired about the fare to Salem and asked to be driven there instead. The driver called his dispatcher and informed him of this fact in accordance with the previous police request. While proceeding south on Route 28, the cab was stopped by a Derry police cruiser driven by officer Thompson. After conversing with the officer some distance from his cab, the driver drove his two passengers to the Derry police station. On arrival the defendants were frisked, asked to come into the station, informed they were being picked up for questioning by the Manchester police, asked

their names, and for their belongings which they produced. Hutton who refused to give his name was placed in a cell. King who gave the name Payson was allowed to remain in the main room of the station. Two Manchester police officers arrived about 15 minutes later and the defendants and their belongings were turned over to them and taken to Manchester.

At a preliminary hearing on motions to suppress evidence obtained by the Derry police, the Trial Court found and ruled that "the detention by the Derry Police up to the point that the Manchester Police arrived was an illegal detention, and that the items seized in the search may not be admitted in evidence." As a result no evidence relating to any of the items which the defendants took out of their pockets in the Derry police station was presented at the trial.

There was testimony at the trial that after being warned of his rights each defendant stated substantially that on October 25, 1965, the day of the Gagne break, he had come to Manchester from Boston with a friend by thumbing a ride arriving in Manchester about 6:30 P.M. Evidence was also admitted that when each defendant was shown the Thunderbird seen at the scene of the crime that night each denied to the police ever having seen the car previously.

Assistant police chief Leavitt of Manchester testified that he fingerprinted the defendants on the day following that of the crime. He also testified that on that same day while processing the Thunderbird in the police station garage area where it had been taken, he found a registration plate on the floor of the rear of the car behind the driver's seat. This plate matched the plate mounted on the front of the car. Upon dusting it with fingerprint powder, he obtained partial latent fingerprints which he compared with Hutton's prints taken previously. This led him to the conclusion, and he so testified, that the prints found on the registration plate were made by Hutton. A fingerprint examiner for the Federal Bureau of Investigation testified that after a comparison of the prints on the registration plate with photographs of those of Hutton he concluded that the fingerprints on the plate were Hutton's.

Lieutenant Curran of the Manchester police testified that he was wearing a top coat on this "cool" night of October 25, 1965 when investigating the Gagne break. There was evidence that the defendants were without topcoats when seen that night by Mrs.

Gagne and police officers. A witness who lived in the vicinity of the Gagne residence testified that on the same night she found two coats, a flashlight, and a pair of gloves under a clothes line located near an alley in back of her house. She turned these articles over to the police and they were admitted in evidence as exhibits.

We hold that on the evidence before it the jury could find beyond a reasonable doubt that the defendants were in the vicinity of the Gagne house on the evening of October 25, 1965 and that furthermore they were the perpetrators of the burglary which took place there at that time. *State* v. *Enright,* 108 N. H. 227, 231; *State* v. *Cote,* 108 N. H. 290; *State* v. *Keegan,* 106 N. H. 152, 153. Defendants' motions to dismiss the indictments and to set aside the verdicts of guilty returned against them by the jury were properly denied and their exceptions thereto are overruled.

The defendants argue that the finding and ruling by the Trial Court, on their motions to suppress, that their detention by the Derry police up to the point that the Manchester police arrived was an illegal detention cannot be questioned on this appeal. We hold that the Trial Court's ruling on this issue has a bearing on the validity of defendants' exceptions to the admission of certain evidence at the trial and to the denial of their motions to dismiss the indictments. Consequently the ruling presents a reviewable question of law transferred to this court by the reserved case. 5 Am. Jur. 2d, Arrest, *s.* 49, *p.* 741. See *Brinegar* v. *United States,* 338 U.S. 160, 171.

An arrest is defined in RSA 594:1 as "the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime." "This is effected by an actual or constructive seizure or detention of the person arrested or by his voluntary submission to custody, both of which subject him to the actual control and will of the person making the arrest." *State* v. *Murray,* 106 N. H. 71, 73. It follows that to constitute an arrest there must exist an intent on the part of the arresting officer to take the person into custody and a corresponding understanding by the person arrested that he is in custody although no formal declaration of arrest is required. *Huebner* v. *State,* 33 Wis. 2d 505. Whether or not an arrest takes place depends upon "the context of the circumstances" and the nature and "validity of law enforcement conduct should not be judicially tested

by *post facto* technicalities and formalisms of no vital importance." *State* v. *Romeo*, 43 N. J. 188, 206.

We now examine in that framework the first incident on Route 28 in Derry. After the police officer signaled the cab to a stop, the officer and the driver held a private conversation at such a distance from the taxi, in which the defendants remained, that it was impossible for them to hear what was being said. The officer told the cab driver: "Why don't you go to the station. I will follow you over. If they [defendants] ask you why, tell them anything, that I stopped you for speeding or a stop sign or something." We cannot conclude from this conversation and its consequences that the officer intended to effectuate an arrest at that time and much less that the defendants were under the power of the officer or submitted to his control. We hold the defendants were not under arrest at that time. *Kelley* v. *United States*, 298 F. 2d 310, 312 (D. C. Cir. 1961); *State* v. *Rye*, 148 N. W. 2d 632 (Iowa 1967); *People* v. *Pruitt*, 79 Ill. App. 2d 209; *United States* v. *McKendrick*, 266 F. Supp. 718, 724 (D.S.D.-N.Y., 1967.)

However, when the cab arrived at the Derry police station, officer Thompson and Lieutenant Gaines asked the defendants to step out of the cab. "We turned them around and went over them to see if they were armed, and asked them to come into the station." Officer Thompson, upon being asked "Supposing they didn't come in?" testified that he would have taken them in. Officer Webster in charge of the station asked the defendants their names and to empty their pockets, which they both did on the top of a desk directly in front of the officer. Defendants were informed they were being held for the Manchester police for questioning. Hutton who refused to give his name was locked in a cell. King who gave the name Payson was permitted to remain at large in the station where there were four or five police officers. Within about 15 minutes the Derry police turned the defendants and their belongings over to officers of the Manchester police department.

There is no material controversy over the essential happenings in this regard. We hold as a matter of law that both defendants were placed under arrest by the Derry police on their arrival at the station. The facts demonstrate conclusively that the Derry officers intended to and were in fact exercising control over the two defendants at that time. Hutton knew he was under physical restraint, being in a jail cell, and King understood he was under

restraint and submitted in consequence by remaining in the police station. *State* v. *Murray,* 106 N. H. 71, 73; *Kelley* v. *United States,* 298 F. 2d 310 ( D. C. Cir. 1961 ); *Huebner* v. *State,* 33 Wis. 2d 505; Restatement ( Second ), Torts, *s.* 112, *pp.* 190, 191.

RSA 594:10 provides that an arrest by a peace officer without a warrant on a charge of felony is lawful whenever "(2) the officer has reasonable ground to believe that the person arrested has committed a felony." "The terms 'reasonable ground' and 'probable cause' in this area of the law mean substantially the same thing." *State* v. *McWeeney,* 216 A. 2d 357, 360 ( R. I., 1966 ). See *Wong Sun* v. *United States,* 371 U. S. 471, 484. Probable cause has been defined as follows: where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been committed. *Brinegar* v. *United States,* 338 U. S. 160, 175; *Draper* v. *United States,* 358 U. S. 307, 311; *People* v. *Williams,* 56 Cal. Rptr. 467, 470. "Probable cause means less than legal evidence necessary to convict though more than mere naked suspicion . . . it is a common-sensible rather than a technical concept . . . it deals with the reasonable probabilities upon which officers must act quickly for the protection of society rather than with the proof beyond reasonable doubt which the State must have to proceed to trial and conviction." *State* v. *Dilley,* ( N.J. 1967 ) 231 A. 2d 353, 355.

On October 25, 1965 the Manchester police were informed by their deputy chief that a burglary had been committed on Montgomery Street next to his residence. Having personally observed the automobile alleged to have been connected with the crime, he immediately informed the station that the Gagne home had been broken into, that a Thunderbird, light green, early 1960's was suspected and was leaving the scene at a fast rate of speed; that one of the victims of the burglary reported seeing two men wearing "light short coats" in the vicinity. The suspected car bearing Massachusetts plates was later chased by the police and abandoned by its driver. The police could reasonably conclude that the two persons seen in the vicinity and the driver of the car were implicated in the burglary, and were from Massachusetts, and would have to seek public transportation to return to their point of origin. There is no question that the Manchester police

possessed sufficient reliable information to constitute reasonable ground to believe that two or three men seeking to leave Manchester for Massachusetts by taxi some time after the burglary were probably its perpetrators and thus had probable cause to arrest them without a warrant.

The Manchester police caused the essential details of this information to be communicated to the Derry police. When officer Thompson intercepted the taxi in which the two defendants were riding, he told the driver "You got two fellows wanted by the Manchester P.D." The defendants were told at the Derry station they were being held for questioning by the Manchester police. We hold that this information received by the Derry police which constituted reasonable ground for arrest without a warrant by the transmitting law enforcement agency also constituted reasonable ground for the arrest of the defendants by the officers of the receiving department. *State* v. *Pederson,* 102 Ariz. 60; *People* v. *Sanders,* 58 Cal. Reptr. 259, 265; *People* v. *Jackson,* 202 Cal. App. 2d 569.

The defendants being lawfully arrested by the Derry police, it was proper as an incident to their arrest to require them to turn over the property they had on their person. *Preston* v. *United States,* 376 U. S. 364, 367; *Cotton* v. *United States,* 371 F. 2d 388, 392 ( 9th Cir., 1967 ); *People* v. *Curcio,* 56 Cal. Rptr. 591, 600; *State* v. *Darabcsek,* 412 S. W. 2d 97, 102 ( Mo. 1967 ). It follows that the coins so obtained by the police, if fruits or evidence of the crime for which the defendants were being tried, were admissible in evidence and were erroneously suppressed by the Trial Court. *Warden* v. *Hayden,* 87 S. Ct. 1642.

The fact that the Manchester police did not charge the defendants with the crime of breaking and entering and larceny until almost four hours after their arrest by the Derry police did not affect the validity of their arrest and was proper. RSA 594:18-a ( supp ) provides in part as follows: "When a peace officer makes an arrest without a warrant, either he or his superior officer may release the person arrested instead of taking him before a district or municipal court if satisfied . . . that there is no ground for making a criminal complaint." The purpose of this statute is to permit the arresting officer to determine whether to charge the arrested person with a crime or to release him. This strikes a balance between the community's interest in law enforcement and the

individual's interest in not being forced to the inconvenience and burden of having to vindicate his innocence in court. See *People v. Bird,* 56 Cal. Rptr. 501, 502; *People v. Mickelson,* 59 Cal. 2d 448, 452.

The taking of defendant Hutton's fingerprints while under lawful arrest did not violate any of his constitutional privileges and evidence of his prints was properly admitted at the trial. *Schmerber v. California,* 384 U. S. 757, 764; *State v. King,* 44 N. J. 346.

Defendants argue that the latent prints obtained from a registration plate found on the floor of the Thunderbird were illegally obtained and erroneously admitted in evidence. This car had been pursued the previous evening by the Manchester police because it was suspected of having been used in this burglary. After a chase at high speeds it was abandoned by the driver in the driveway of a florist establishment. This, together with the unmatched registration plates which it bore, suggested a strong possibility that it had been stolen. The police properly had it in their custody when it was searched at the station. We hold that under all the circumstances the search was reasonable and lawful and the evidence which it produced was properly admitted at the trial. *Cooper v. California,* 386 U. S. 58, 62; *State v. Rowan,* 163 So. 2d 87, 94; *Stewart v. People,* 426 P. 2d 545 ( Colo. 1967 ); *People v. Lozano,* 58 Cal. Rptr. 102; *State v. Boykins,* 232 A. 2d 141, 143-146 ( N.J. 1967 ); *St. Clair v. State,* 232 A. 2d 565, 569-573 ( Md. App. 1967 ).

Finally we consider defendant Hutton's contention that the Trial Court erred in its charge on the issue of reasonable doubt. He argues in his brief that by "equating the issue of reasonable doubt . . . to a judgment as to whether or not the jurors would hesitate to undertake an important business or personal undertaking it emasculated the burden of proving beyond a reasonable doubt." Similar language was used in *State v. Mannion,* 82 N. H. 518, 525, 526 and is also used in federal courts and many state courts. *Commonwealth v. Donough,* 377 Pa. 46; *State v. Merry,* 136 Me. 243; *Lambert v. State,* 193 Md. 551; *Scurry v. United States,* 347 F. 2d 468 ( D.C. Cir., 1965 ); *Holland v. United States,* 348 U. S. 121. We are of the opinion that the Trial Court's instructions taken as a whole correctly conveyed the concept of

reasonable doubt to the jury. *Holland* v. *United States, supra,* 140.

*Exceptions overruled.*

GRIFFITH, J., did not sit; the others concurred.